# SEEBERGER *v.* RUSSEL.

---

PATENTS; INTERFERENCE; REDUCTION TO PRACTICE; SUFFICIENCY OF EVIDENCE; DELAY IN FILING APPLICATION.

1. Where the inventor of an escalator and auxiliary traveling platform, and two witnesses, who show themselves thoroughly familiar with its construction, testify fully as to the construction and operation of the device, and state that they used it a number of times and found it successful, a reduction to practice is sufficiently proved and it is unnecessary that the facts on which they base their conclusion as to the successful working of the device should appear on the record. (Distinguishing *Gallagher* v. *Hien*, 25 App. D. C. 77.)

2. Although the fact that, after an alleged successful operation of a device, the device was taken apart and one element never used again, is sufficient to warrant an inference that the test was not successful, yet, when a reasonable and satisfactory explanation of such fact is given, such an inference is unwarranted.

3. A delay of two years and a half in filing an application for a patent

D. C.]                          Opinion of the Court.

is not sufficient to destroy the weight of proof of an actual reduction to practice,—especially where it appears that drawings showing substantially the same construction as the original device were sent to· the applicant's attorneys more than a year before the filing of the· application, and before anyone else had entered the field.

No.   315.   Patent Appeals.   Submitted   November   21,   1905.   Decided. December 5, 1905.

HEARING on an appeal from a decision of the Commissioner of Patents in an interference case.                *Reversed.*

The facts are sufficiently stated in the opinion.

*Mr. Chas. E. Foster* and *Messrs. Coburn & McRoberts* for the· appellant.

*Mr. C. T. Benedict* and *Mr. A. L. Morsell* for the appellee.

Mr. Chief Justice SHEPARD delivered the opinion of the· Court:

This is an interference proceeding between rival claimants of' the invention described in the following issue:

"1. The combination with an endless movable carrier, of a landing, said landing consisting of a fixed framework and one or more movable parts or sections, and means for moving the upper surface of the movable portion of said landing in the same· direction as and independently of the moving carrier.

"2. In a device of the class described, the combination with the ways having the inclined and horizontal portions of the· steps mounted to travel thereon, and forming a landing on the· horizontal portion, means for driving said steps, an auxiliary landing adjacent to the landing formed by the steps, and means. for driving said auxiliary landing at different speed from that. of the steps."

The application of Russel was filed February 15, 1902, that. of Seeberger, June 7, 1902.   Both disclose a traveling stairway or escalator composed of an endless chain of steps which assume·

the form of stairs when moving up the inclined ways, and the flat condition of an ordinary landing when traveling in a horizontal plane. In combination with such a structure is shown an auxiliary landing traveling in the same direction as the stairway, but at a lower rate of speed in order to facilitate entrance upon, and exit from, the higher-speed stairway when moving in a horizontal plane. When the stairway is moving at the ordinary speed required in the majority of cases, say not more than 100 feet per minute, the auxiliary landing is not necessary to enable the average user to step with safety from the stairway to the stationary landing.

The Examiner of Interferences awarded priority to Russel, and was reversed by the Examiners-in-Chief, who, in turn, were reversed by the Commissioner.

Russel alleges conception of the invention in December, 1900, disclosure to others about August 12, 1901, and admits that no model, or full-sized machine embodying the invention, has ever been made. Whether these dates have been established is immaterial, for all of the tribunals of the Patent Office agree that Seeberger conceived the invention and disclosed it to others between June and December of 1899. The substantial question for determination is, whether, during that time as alleged, Seeberger reduced the invention to practice. The Examiners-in-Chief were clearly of the opinion that he did. The Examiner of Interferences was equally convinced, from all of the evidence and surrounding circumstances, that what he did amounted to nothing more than an abandoned experiment, and that he was not exercising diligence when Russel entered the field. The Commissioner said that the decision depended upon the legal effect to be given to the work done by Seeberger in 1899, for if that was not a reduction to practice, he had not shown the requisite diligence thereafter. He then said: "Seeberger and his witnesses Henderson and Venn testify that they were employed by the Otis Elevator Company in 1899, and that there was built for this company, under the direction of Seeberger, at Yonkers, New York, a machine which consisted of the combination with a traveling stairway of an auxiliary traveling

landing. Seeberger states that he conceived the combined stair-way and landing some time before the landing was actually placed upon the machine, but that it was not placed on the machine until the fall of 1899, and that it was operated at that time with satisfactory results. Venn testifies to the same effect. Henderson testifies to the same facts. There is therefore no doubt of the fact that an apparatus embodying the invention of the issue, namely, a traveling stairway in combination with an auxiliary traveling landing, was actually constructed as early as November, 1899, and experimented with for a short period of time. It is necessary to determine whether this device was a reduction to practice of the invention of the issue by Seeberger."

In the testimony of these witnesses above referred to, it is to be noted that they merely state that, in their opinion, the result of the experiments was satisfactory. No facts, however, appear from the record upon which a conclusion may be reached that these witnesses were justified in their opinions. The court of appeals of the District of Columbia, in the case of *Gallagher* v. *Hien,* 115 Off. Gaz. 1330, 25 App. D. C. 77, 83, held that such facts should appear from the record in order to warrant the holding that the inventor and his witnesses were right in their opinion that the results of certain tests were satisfactory. In that case, Gallagher and his witnesses testified that tests of the device under consideration had been made, and that the tests were satisfactory. The court said, with respect to this testimony, that the mere opinion of the witnesses as to the alleged successful tests could not be accepted in the absence of any facts appearing in the record "which enable us to determine whether he (Gallagher) was justified in his conclusion that the result of the test was satisfactory."

We are constrained to disagree with this view of the evidence relating to the reduction to practice, and of the application of the doctrine of *Gallagher* v. *Hien.* It must be remembered that Seeberger had for several years been occupied in the invention and perfection of the escalator,—a name which he had himself coined.

Venn was also an inventor and expert in the art. Henderson

was a mechanical draftsman of the Otis Elevator Company, and had worked on plans and patterns for the escalator erected in 1899. This was used in a building of the Otis Elevator Company to test it, and was exhibited to visitors. Working satisfactorily, it was, more than a year afterward, transferred to the department store of the Siegel & Cooper Company in Chicago, adapted to the conditions there, and put in constant use. Venn, who was familiar with all the details of Seeberger's drawings and constructions, testified that the auxiliary traveling landing was attached to this construction in the fall of 1899, and, having particularly described its construction, attachment, and operation, said: "It was driven at half the speed of the steps and in the same direction as the steps. It was located at the top landing alongside of, and running parallel with, the horizontal run of the steps."

He then said that he saw the escalator and auxiliary landing in actual operation frequently, and that he rode upon it a dozen or more times, making use of the traveling auxiliary landing for the purpose of getting off the escalator at the top. After this, he said that he found it satisfactory and successful. Henderson, with the drawings before him, gave an elaborate description of the construction, attachment, and operation of the auxiliary landing. He said that he rode upon the escalator and used the auxiliary landing constantly, during the month and more that it was attached, and found it both satisfactory and successful. During this time no change or improvement was made in it. Seeberger testified even more fully as to construction and operation, and produced a diary, apparently regularly kept and free from suspicion, showing an entry to the effect that the auxiliary landing was working successfully. It appears, beyond all question, that he wrote to his patent attorneys on March 31, 1901, describing the auxiliary landing, and sent them several sheets of drawings identical with those attached to this application. According credibility to all of these witnesses, as was done by all the tribunals of the Patent Office, we think that they satisfactorily establish the reduction of the invention to practice. As was said in the decision of the Examiners-in-Chief:

"It is of no consequence that the escalator proper was not required, in order to do its duty, to have an auxiliary traveling platform. The escalator and the landing were run at the proper direction and relative speed, whether the speed of the escalator was to be, in any instance, greater or less. To adapt it to a situation where an auxiliary landing was needed required nothing more than a difference of speed at which the apparatus should be operated. The use of the two elements combined which demonstrated its utility at a low speed of operation demonstrated its utility at a high speed of operation."

The testimony in *Gallagher* v. *Hien* was quite different from that above recited. The device of the invention in that case consisted of expansible resilient rings constituting a friction spring for use in car couplings. These were necessarily compelled to have great strength under the pressure to be expected in their intended use. The first test claimed as reduction to practice was by Gallagher alone in the shop through pressure in a vise. Of this it was said by Mr. Justice Duell, who delivered the opinion: "What that pressure was he does not state, nor does he state any facts which enable us to determine whether he was justified in his conclusion that the result of the test was satisfactory."

Afterward the device was taken to Bridgeport where some slight changes were made, and the springs tempered. It was then put in a vise, and then on the anvil of a powerful steam-hammer where it was held in place by a pair of blacksmith's tongs. After being repeatedly struck with the hammer, the springs were broken by a hard blow. The pieces were gathered up, taken to New York and laid away for future use. They were never again used for any purpose until produced in the interference proceeding with Hien. Another witness says that, not having a power-press at Bridgeport shops, the device was squeezed in a vise and found to work as a spring, but the power of the vise was not great enough to close the spring. It stood a light blow of the steam-hammer but broke under a harder one. This witness expressed no opinion as to the result of the test. No measurements were taken to show the tensile strength or the pressure to which the springs were subjected. An officer of the Standard Coupler

Company, which was prosecuting the case, as noted in the opinion also, thought it was "worth experimenting with." More than a year after the tests, he is recorded as saying: "I thought there was enough in the idea to warrant some experiments."

Another point made in the decision, adverse to Seeberger, deserves some consideration also. It appears that the auxiliary traveling platform was removed from the escalator a month or more after its attachment, and never replaced. The parts were kept together until after the application for patent was filed. After that, in removing the building in which they had been stored, some of the parts disappeared. The escalator was removed to the store of Siegel & Cooper Company and there erected and used without a traveling platform. Twelve escalators in all have been built without a traveling-platform attachment. These facts were not regarded as showing a suppression of the invention,—and rightly so under the circumstances,—but were given great weight as tending to show that the alleged test had not been, at the time, regarded as successful. Such circumstances, when unexplained, undoubtedly tend strongly to create such an inference, and have always been given great weight in the absence of conclusive proof of successful reduction.

The explanation given, however, we regard as reasonable and satisfactory. The testimony shows that when the escalator was first erected in the factory building at Yonkers, New York, the landing for egress was located on the left side. It was afterward concluded to change this egress to the other side. This involved changes in the escalator-castings. During the time these were being made the landing on the left was removed, and the traveling landing was put in operation, and continued for more than a month. When the construction was ready for change to the landing on the other side, the traveling landing was removed and stored. It also appears that the traveling landing is an unnecessary attachment to an escalator moving short distances, and at a speed not exceeding 100 feet to the minute. Its sole purpose is to protect from danger of falling in stepping from the moving stairway when at a high rate of speed. The slow speed is adapted to short distances, as in the then testing use of the es-

calator, and met the requirements of use in the Siegel & Cooper Company building, as well as in the other cases of later construction. The auxiliary platform was not, therefore, a thing of immediate commercial value. This value depended upon the adoption of the escalator for long distances where rapid speed is important, as in the case of elevated railways and the like. It is to be remembered that escalators are very expensive constructions, and that their use must always be comparatively limited. To lay aside the auxiliary platform at the time, and not to incorporate it in subsequent constructions where high speed was not required, was not unreasonable, and it is not, therefore, a circumstance sufficient to overcome the clear proof of satisfaction with its test in actual use. There was some delay in applying for a patent, it is true, but this is also insufficient to destroy the weight of the proof of actual reduction to practice. No change was made—certainly no material one—in the device of the original construction, and the original drawings were copied in a form proper for presentation to the Patent Office, and sent to the patent attorneys for attention on March 31, 1901. Seeberger was in Europe attending to matters relating to escalators at the Paris Exposition from April until the latter part of December of 1900. No rival had entered the field when he forwarded the drawings, and he knew nothing of the invention of Russel until the interference was declared. The latter, as we have seen, has never constructed an escalator or an auxiliary platform for attachment to one, and did not enter the Patent Office until February 15, 1902, although he says in his preliminary statement that he conceived the invention about December, 1900, but did not disclose it to anyone until August 12, 1901. We attach no material weight to the fact that part of the traveling platform was lost or destroyed after removal and storage, because this did not occur until after the application had been filed. The loss has been not unreasonably explained, and, under all the circumstances, heretofore mentioned, it is entitled to no effective weight.

It follows that the decision of the Commissioner must be reversed. It is so ordered, and that this decision be certified to the Commissioner of Patents as required by the law. *Reversed.*