28 C.C.P.A. (Patents)

## MARDEN et al. v. BRASELTON.
### Patent Appeal No. 4443.

Court of Customs and Patent Appeals.
April 14, 1941.

Rehearing Denied June 9, 1941.

J. W. Greenbowe, of Bloomfield, N. J. (Loyd H. Sutton, of Washington, D. C., and Towson Price, of Bloomfield, N. J., of counsel), for appellants.

Harry Price, of New York City (H. R. Davies and Braselton, Whitcomb & Davies, all of New York City, of counsel), for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

LENROOT, Associate Judge.

This is an appeal from a decision of the Board of Appeals of the United States Patent Office in an interference proceeding, awarding priority of the subject matter of all the counts in issue, ten in number, to appellee Braselton. The decision of the board reversed the decision of the Examiner of Interferences, which had awarded priority of invention as to all the counts to appellants.

The interference arises between an application of appellants filed November 19, 1931, and an application of appellee filed October 15, 1930. Appellants, being the junior party, had the burden of proving priority of invention by a preponderance of the evidence.

Interference No. 69,449 here involved, as originally declared, contained three counts, and was a three-party interference involving the parties to this appeal and one Gibson. On motion of Gibson four other counts were added to the interference, being counts 4, 5, 6 and 7 of

the issue now before us. It appears from the record that the third party, Gibson, was eliminated from the interference upon failure to respond to an order to show cause why judgment on the record should not be entered against him. This left in Interference No. 69,449 the parties to this appeal, the issue consisting of present counts 1 to 7, inclusive.

At the time Interference No. 69,449 was declared, a second interference, No. 69,451, was declared between the parties to this appeal, upon the same applications involved in Interference No. 69,449. This was a two-party interference and, as originally declared, the issue therein consisted of two counts. Upon motion of the party Braselton, appellee here, a third count was added to the interference. Subsequent to the elimination of the party Gibson from Interference No. 69,449, Interference No. 69,451 was consolidated therewith, and the three counts forming the issue in Interference No. 69,451 became counts 8, 9 and 10 of Interference No. 69,449.

Of the counts constituting the issue of the interference, counts 1, 5 and 9 are thought to be illustrative and read as follows:

"1. A negative glow lamp of the gaseous conduction type comprising an enclosing envelope, a plurality of thermionically active electrodes therein and a grid located between said electrodes."

"5. A gaseous conduction lamp comprising an envelope, an ionizable medium therein, a plurality of thermionic electrodes and a grid also located therein, said electrodes being spaced from each other and supported by a press, said grid being located in the space between said electrodes, each of said electrodes including a hollow body having a thermionically active surface and a heater element, said heater elements being connected in electrical series relationship, said grid also being supported by said press."

"9. An ultra violet lamp comprising an enclosing envelope, an ionizable medium, a plurality of electrodes and a grid located therein, said electrodes being spaced from each other and supported by a press, each of said electrodes including a heater element and a thermionically active material, a grid located in the space between said electrodes, said grid being in electrical parallel relationship with one of said electrodes."

In his decision the Examiner of Interferences described the subject matter of the interference as follows: "The subject matter of this interference relates to lamps of the negative glow ultra violet type. The lamp comprises an envelope having a suitable ionizable medium therein and a plurality of electrodes having a thermionically active coating. Heating elements connected in series are provided for the electrodes and at least one grid is located in the space between the electrodes."

In a preliminary statement and in a supplemental preliminary statement appearing in the record, appellants alleged conception of the invention in issue about January 1930; actual reduction to practice by the making and operation of a full-sized device in February 1930; that they made and operated several other full-sized devices, the time of the making and operation of such other devices not being alleged; and that they were diligent in adapting and perfecting the invention from about January 1930 until the invention was reduced to practice.

No preliminary statement on behalf of appellee appears in the record. That one was made appears from the decision of the Examiner of Interferences.

In the early stages of Interferences 69,449 and 69,451, before their consolidation as aforesaid, appellants moved to dissolve the interferences on the ground that the three counts forming the issue of Interference 69,449 and the two counts of Interference 69,451 (now counts 1, 2, 3, 8 and 9) were unpatentable, and also on the ground that appellee here could not make claims corresponding to those counts for reasons set forth in said motion. The Primary Examiner in decisions in those interferences denied said motions to dissolve, and in addition, as above stated, permitted (over the objection of appellants) the addition of four counts to the issue of Interference 69,449 (present counts 4, 5, 6 and 7), and the addition of one count to Interference 69,451 (present count 10).

The Examiner of Interferences, in a decision in the consolidated interference now before us, held that appellants had established conception of the invention "at least as early as April 30, 1930;" that they had established actual reduction to practice of the invention as of the same date, and that "Since the earliest date alleged by Braselton is subsequent to the date awarded to Marden and Nicholson for reduc-

tion to practice, the party Marden and Nicholson must prevail." He thereupon awarded priority of invention as to all of the counts to appellants.

Upon appeal the Board of Appeals concurred in the examiner's finding of April 30, 1930, for conception of the invention by appellants, but disagreed with the examiner on the question of whether they had shown a reduction to practice. The board held that there was no satisfactory proof of reduction to practice by appellants prior to their filing date, November 19, 1931, and further held that they had not established diligence from a time just prior to appellee's entry into the field until such filing date. In addition, the board considered the questions raised by appellants of the right of appellee to make claims corresponding to the counts, and held that the Primary Examiner had correctly held that appellee could make such claims.

Two fundamental questions are before us on this appeal: (1) The right of appellee to make claims corresponding to the counts of the issue; and (2) whether appellants have established a reduction to practice of the invention prior to their filing date, and if not, whether diligence on their part has been established during the critical period. We will consider these questions in that order.

The question of appellee's right to make claims corresponding to the counts in issue was first raised before the Primary Examiner in appellants' motions to dissolve in the two interferences then existing, in which motions it was urged that Braselton could not make claims corresponding to the counts because he does not show a "negative glow" lamp and because he does not show an "ultra violet" lamp. No other grounds were alleged.

Responding to these contentions of appellants, the Primary Examiner in Interference 69,449 stated as follows:

"The party Marden et al. contends that the party Braselton is not entitled to make the counts on the grounds that (a) he does not disclose a 'negative glow lamp' as recited in the preamble of count 1, and (b) that he does not disclose an 'ultra violet lamp' as recited in the preamble of counts 2 and 3, and (c) that he does not have a 'grid' as required by counts 1 to 3.

"(a) The discharge of electricity through a gaseous atmosphere shows two principle divisions, a luminous region close to the cathode (or electrode instantaneously functioning as cathode) called the negative glow, and another luminous region extending from near the cathode glow to the anode however far the latter may be from the former, called the positive column. It has become customary to designate as negative glow lamps those in which the electrodes are placed sufficiently close together as to substantially exclude the positive column. The tubes disclosed by Braselton fall into this general category as he makes use of the glow immediately surrounding the electrodes and does not have sufficient spacing to obtain a positive column.

"(b) It is a well known fact as pointed out by the party Braselton in argument that electric discharges in gases produce ultra-violet radiation along with visible radiation and that common glasses transmit ultra-violet radiation in some degree. The preamble of a claim is a general statement identifying the art or field of invention to which the invention pertains. The term 'ultra-violet' in the preamble of counts 2 and 3 merely indicates a preferred use of the structure recited thereafter. Preambles of claims sounding in use have no force as limitations on the structure. It is therefore not material to Braselton's right to make these counts that he did not disclose an intention to utilize the ultra-violet component of the radiation from his lamps.

"(c) Braselton discloses in his Fig. 4, on which the counts 1 to 3 are readable, a helically wound wire element 49. This element is a grid within the definition given on page 2 ante. The helix is a common form of structure denoted by the term grid (grille) as indicated by the French patent 607,650 cited by Marden.

"The party Braselton can properly make claims corresponding to the counts 1 to 3."

It does not appear from the record in what manner the question was raised as to whether appellee discloses a grid.

In Interference 69,451 the Primary Examiner stated: "The counts 1 and 2 are properly readable on Fig. 4 of Braselton. The helices 48, 49 are properly called grids. Note that the French patent applies the term grid (grille) to the helix. Since electric discharges in gases produce ultra-violet radiation commingled with visible radiation, as is well known, no inaccuracy results in reading the counts

on Braselton. The term 'ultra-violet' in the preamble imports no specific limitation upon the structure recited by the counts."

In a petition for reconsideration common to both interferences, appellants again urged that appellee could not make the claims constituting the counts, for the same reasons as before stated, and complained of the examiner's holding that appellee's helices constituted grids. No other ground for reconsideration was set forth. In disposing of this petition the examiner, in a decision in Interference 69,-449, stated as follows: "The decision of August 26, 1935 has been carefully reviewed in view of the briefs submitted in support of, and in opposition to, the petition of the party Marden and Nicholson for reconsideration and modification. The patents cited in the petition are typical of those taken into consideration as background art by the Examiner, in his official capacity as expert in the art, in arriving at the decision questioned. No error is discovered in the decision requiring modification."

The examiner declined to consider this petition for reconsideration as part of Interference 69,451 unless a second copy was filed in that interference. Presumably this was not done as no decision in this interference on a petition for reconsideration appears in the record certified to us.

In the decision of the Board of Appeals upon appellee's appeal from the decision of the Examiner of Interferences, the board considered the question raised by appellants here of the right of appellee here to make the claims constituting the counts, and stated:

"Marden et al. raised a question of the right of the party Braselton to make the claims forming the issues of this interference. The examiner on motion considered this matter and held that the Braselton disclosure was sufficient to support the counts. Marden et al. contend that Braselton does not disclose a 'negative glow lamp' as recited in the preamble to count 1 nor an 'ultra-violet lamp' as recited in counts 2 and 3 and does not have a 'grid' as required by counts 1-3.

"The examiner in his decision explained the principles of discharge of electricity through a gaseous atmosphere creating a negative glow and a 'positive column.' If the electrodes are placed sufficiently close together to exclude the positive column, then such lamps are designated as negative glow lamps and he held that the tubes disclosed by Braselton fall into this category. He further pointed out that ultra-violet radiation is produced in electric discharges in gases along with visible radiation and that common glasses transmit ultra-violet radiation to some degree. None of these facts is disputed by Marden et al. Their contention is that Braselton had no idea of developing ultra-violet light with negative glow. As for the term 'grid' as used in the claims, it has a broad definition and the helically wound wire 49 of Fig. 4 of Braselton would come within this definition.

"Appellant urges that the two lamps, that of Marden et al. and of Braselton, operate in a different manner and that may be, but the counts are broadly drawn and we believe should not be limited to a type of lamp disclosed specifically by Marden et al. as contrasted with the lamp disclosed by Braselton. We note that in Fig. 4 of Braselton the coated member 38 surrounds a heating element and the discharge occurs between such coating and coil 48. In the Marden et al. construction, the element 63 in Fig. 3 is similarly coated and might be compared to the element 38 of Braselton and the element 68 of Marden et al. might be compared to the element 48 of Braselton as broadly set forth in the counts of the interference.

"We also note that certain claims are concerned with a gaseous conduction lamp only and not necessarily an ultra-violet negative glow lamp. In our opinion the claims are not sufficiently specific to distinguish over the Braselton. construction."

It will be observed from said quotation that apparently there were only three points upon which appellants relied in their contention that appellee's application does not support the counts.

In a lengthy petition for reconsideration of the board's decision appellants again discussed this question, among others, and in this discussion strongly urged, apparently for the first time, that Braselton could not make certain of the counts because he did not show a structure supporting the element of certain of the counts which, in count 9 reads: "said grid being in electrical parallel relationship with one of said electrodes," and did not disclose a perforated grid, as embraced in some of the counts.

The board responded very briefly in its decision on appellants' petition for re-

consideration, stating as follows: "We are held to have overlooked certain features of the counts in our holding that they read on Braselton. Appellants have not discussed any new points in this connection and we believe our decision should stand."

It thus appears that in three decisions by the Primary Examiner and two by the Board of Appeals this question of the right of appellee to make claims corresponding to the counts has been considered, upon all of the grounds raised by appellants prior to their motion for reconsideration of the first decision of the Board of Appeals.

■ Inasmuch as the question of whether or not appellee's application discloses a grid in parallel electrical relationship with one of the electrodes, or an apertured or perforated grid, was not raised in appellants' motion to dissolve, or, so far as the record shows, in objections to amendments adding counts to the interference, and as these grounds were not considered by the Primary Examiner or, as we view it, by the Board of Appeals, we do not feel that these questions are properly before us. Herthal et al. v. Dubbs, 65 F.2d 138, 141, 20 C.C.P.A., Patents, 1128.

As said in the case last cited, a consideration of this question "would carry us into a field which none of the tribunals below has explored."

In taking this position we have not overlooked the statement of the board in its decision upon reconsideration that: "We are held to have overlooked certain features of the counts in our holding that they read on Braselton. Appellants have not discussed any new points in this connection and we believe our decision should stand."

We do not regard this language as meaning that the board had considered the question of appellee's disclosure relative to the grid being in parallel electrical relationship with one of the electrodes, or appellee's disclosure of an apertured or perforated grid. If the board had considered these questions, it is strange indeed that no mention was made of them; their original decision states that the grounds urged by appellants with respect to appellee's right to make the claims forming the issues of the interference were that appellee's application does not disclose a "negative glow lamp" nor an "ultra-violet lamp" and does not disclose a "grid." This statement coincides with the statement of the Primary Examiner

as to appellants' contentions as hereinbefore noted.

We think it proper to observe in this connection that we have had no assistance from appellee's brief upon the question of his right to make the claims corresponding to the counts. Appellee's counsel have contented themselves with merely quoting in an "Appendix" certain excerpts from the decisions of the Patent Office tribunals. The matters last above described are completely ignored in appellee's brief and, as hereinbefore stated, are not discussed in the decisions of the Patent Office tribunals.

It is of no assistance to us merely to quote excerpts from the decisions herein of the Patent Office tribunals for, of course, such decisions would receive our careful consideration without such quotation.

We now turn to a consideration of appellee's right to make claims corresponding to the counts upon three grounds urged by appellants.

These grounds are: That appellee does not disclose (1) a "negative glow lamp" as recited in counts 1, 8 and 10, (2) an "ultra violet lamp" as recited in counts 2, 3 and 9, and (3) a "grid" as recited in each of the counts.

■ The Primary Examiner pointed out that a discharge of electricity through a gaseous atmosphere shows two principal divisions, a negative glow and a positive column; that a negative glow is the luminous region close to the cathode and a positive column is the luminous region extending from near the cathode to the anode, however far the latter may be from the former; that it is customary to designate as negative glow lamps those in which the electrodes are placed sufficiently close together so as to substantially exclude the positive column; that the lamp disclosed by appellee is of the last-named type, as he makes use of the glow immediately surrounding the electrodes and does not have sufficient spacing to obtain a positive column. The Board of Appeals agreed with this view.

We cannot find that appellants disagree with this view in so far as the structure disclosed by appellee is concerned; but, as we understand their contention, it is claimed that in the indicated operation of the structure appellee does not secure a "negative glow."

Even were this true, it is the structure that is here involved. These are not method claims, and if the structure disclosed by appellee is adapted to secure a negative glow lamp, appellee had the right to make the claim for a "negative glow lamp." Appellants admit that a negative glow light is disclosed in appellee's application, though not so denominated, but contend that such negative glow light is secured only in *processing* the lamp for the ultimate use intended by appellee.

Even if this be true, we regard it as immaterial, for the operation of the lamp, or *processing* as appellants term it, has nothing to do with the structure disclosed.

We are in agreement with the decisions of the Patent Office tribunals that appellee's application discloses a negative glow lamp.

■ With respect to appellants' contention that appellee does not disclose an "ultra violet lamp," we would observe that the Primary Examiner stated that electric discharges in gases produce ultra-violet radiation, along with visible radiation, and that the preamble in the counts reciting an "ultra violet lamp" merely indicates a preferred use of the structure recited in the counts, and that it was immaterial that appellee did not disclose an intention to utilize the ultra-violet component of the radiation from his lamp. The Board of Appeals was in agreement with this view.

We are clear that the device disclosed by appellee is adapted to produce ultra-violet radiation, and under the facts in the record the term "ultra violet lamp" should not be regarded as a limitation in the counts. Braren v. Horner, 47 F.2d 358, 18 C.C.P.A., Patents, 971.

The last question upon this branch of the case is whether appellee's application discloses a grid as called for by each of the counts.

■ Appellee clearly discloses in his Figure 4, and describes in his application, a plurality of thermionic electrodes, and between them coils of tungsten wire surrounding each of them and spaced therefrom. It is these coils of wire which the Patent Office tribunals held to be grids responding to the element of the counts requiring a grid.

It is appellants' contention that while, under some circumstances, such coils might in the electrical art be termed "grids," in appellee's disclosure they do not function as such, and therefore are not grids within the meaning of that term as used in the counts.

Appellants insist that in the electrical art a grid is an electrode having one or more openings for the passage of electrons or ions, and that in appellee's disclosure, because of the electrical connection between his cathode sections, there cannot be any discharge or electron flow through his coils, which coils the Patent Office tribunals hold are grids within the meaning of the counts. This question of function is very technical, and although not discussed in the decisions of the Board of Appeals or the Primary Examiner, it was presumably considered by each of them, for the record shows that in motions for reconsideration of decisions this point was strongly urged by appellants.

We are not satisfied that in the operation of appellee's structure there cannot be any discharge or electrical flow through the turns of his coils, even if this question of function were determinative of the question of whether appellee discloses a grid.

For the reasons stated, we are unable to hold that the Board of Appeals erred in finding that appellee's application discloses a "grid" as recited in the counts.

Before concluding upon this branch of the case we think it proper to observe that in appellants' motion before the Board of Appeals for reconsideration of its decision it is stated:

" * * * *anybody* skilled in the art, after seeing the structure covered by the counts, could, in view of the development of the art at the time the invention was made, make a satisfactory lamp with such structural features, *without* any exercise of invention!
* * *

"On page 4 of Your Honors' decision, the statement is made that the Examiner on Motion held that the Braselton disclosure was sufficient to support the counts. The reason he did this was because he merely considered the *physical structure* of the lamps, while *ignoring* the *functions* and the *connections*."

Of course it is structure alone that is involved in the counts. It may be that if appellants had recited additional structure embracing connections in the lamps, in addition to those stated in the counts, appellee could not have made claims corres-

ponding thereto; but that question is not before us.

■ The counts before us are broadly drawn; they relate to the same general subject matter, viz., electric lamps of the gaseous conduction type; the counts must be broadly construed, and it is elementary that we may not read limitations into them.

We next come to a consideration of appellants' claimed reduction to practice. As hereinbefore stated, the Examiner of Interferences held that appellants were entitled to a date for reduction to practice as of April 30, 1930, and that since the earliest date alleged by appellee is subsequent to said date, priority of invention with respect to all the counts should be awarded to appellants.

The Board of Appeals, while agreeing with the Examiner of Interferences that appellants were entitled to the date of April 30, 1930, for conception of the invention, held that there was no satisfactory proof of reduction to practice by appellants prior to their filing date, and further held that diligence had not been shown by appellants in reducing the invention to practice.

Each of the appellants testified that lamps embodying the structure of the counts were successfully operated in the month of April, 1930. The testimony of appellant Nicholson upon this point reads in part as follows:

"Q. 21. You state that as far as you know the lamp [Exhibit 4] referred to is one of those made by Dr. Marden and yourself. Have you actually seen such a lamp successfully operated as a negative glow ultra-violet lamp?

"By H. Price: Objected to as leading.

"A. Yes.

"Q. 22. Who successfully operated such a lamp, and when did this take place?

"By H. Price: Objected to as leading.

"A. Dr. Marden and myself operated such a lamp in the month of April, 1930.

"Q. 23. What is in the bulb of the lamp referred to, beside the structure? A. The bulb contains mercury and the vapor thereof.

"Q. 24. Did you and Dr. Marden make any lamps of the type of this exhibit, which contained anything else besides mercury as a filling atmosphere and if so, what and when were such lamps made and tested? A. Dr. Marden and I made lamps containing argon in addition to the mercury vapor. These lamps were made and tested during the first half of the month of March, 1930.

"Q. 25. What was the result of testing such lamps as you have described? By this I mean lamps constructed in accordance with this exhibit and with and without argon in addition to the mercury vapor. A. The results of testing these lamps indicated the amount of ultra-violet radiation obtained under varying conditions of operation and varying changes in structure.

"Q. 26. Did these results show anything with regard to the practicability of using these lamps for the production of ultra-violet light?

"By H. Price: Objected to as leading and calling for a conclusion.

"A. These results indicated that lamps embodying such features efficiently produced ultra-violet light. Such lamps *would* operate successfully for many hours. (Italics ours.)

* * *

"Q. 34. I understand from your testimony that you and Dr. Marden personally made the lamps like Exhibits 4 and 6. Can you not state by an inspection of the workmanship on these lamps whether or not these are not actually lamps made by you and Dr. Marden in March or April of 1930? A. From the looks of the lamps I have every reason to believe that they are lamps which we made during the specified time. These lamps, Exhibits 4 and 6, exhibit no features different from those which we did make at this time. Having been out of my possession for a number of years, I cannot state whether they are the identical lamps or lamps made embodying the same features. The parts and workmanship are such to lead me to believe that they are lamps referred to.

"Q. 35. Please state whether or not the lamps which you and Dr. Marden [made] and successfully tested in March or April, 1930, included all the elements of the lamps of Exhibits 4 and 6.—arranged as shown in these exhibits. A. Yes.

"By H. Price: Objected to as leading."

It will be observed that this witness did not testify that the lamp *did* operate for many hours, but simply that it *would* operate for many hours. This, we must

assume, was nothing more than an expression of opinion of the witness.

Upon cross-examination this witness testified as follows: "XQ. 49. Referring to your application involved herein, Serial No. 576,022, what specific improvements in respect to efficiency, age, current, amount of U. V. radiation and amount of ordinary radiation were you attempting to obtain by the lamps as shown in this application? A. Improved efficiency, greater life, greater amounts of ultra-violet radiation for a given amount of current resulted from features disclosed in Ser. No. 576,022."

Appellant Marden testified that about July 1930 "a considerable number, perhaps a hundred" of the lamps embodying the invention "were made and put on life test to determine the characteristics of this type of device." The witness further testified as follows:

"Q. 69. For approximately what period of time were lamps embodying the joint invention on life test? A. These life tests ran over a period of five hundred or one thousand hours, were started about the end of July or in August, and since the groups were not all started at one time, the tests probably continued throughout the latter part of 1930. In burning five hundred or one thousand hours sometimes the life test was continuous burning and sometimes it was on what is called an on and off schedule. This is done because the life of lamps of this type is often materially different when turned on and off than when burned continuously."

We find no testimony in the record as to whether this so-called "life test" was successful or not.

Appellants' physical Exhibits 4 and 6 were introduced in evidence, and there is testimony, not contradicted, that these exhibits embody the structure of the counts. These lamps are, however, not positively identified as having been made and tested at any particular time, but appellants testified that they believed that they made these exhibits and that they are like those they made in April, 1930.

The only corroborating witness was Dr. Harvey C. Rentschler, Director of Research of the Lamp Division of the Westinghouse Electric & Manufacturing Company, under whom appellants worked, they also being employed by said company at the time of the claimed reduction to practice here involved.

Dr. Rentschler testified to the disclosure to him of the involved invention by appellants. He further testified in part as follows:

"Q. 55. I hand you two sheets marked Marden and Nicholson Exhibit 2 [appellants' report to Westinghouse Patent Department] and ask you to identify this and state what it represents in connection with the ultra-violet lamp development which you have just described. A. This disclosure also witnessed by me suitable for operating with a higher current so as to produce a greater output of ultra-violet radiation. It also discloses the use of a grid structure to relieve the indirectly heated cathodes of some of the bombardment by the discharge current so as to be able to obtain a more satisfactory life and to prevent overheating of the electrodes in spots by the bombardment.

"Q. 56. I hand you a lamp marked Marden and Nicholson Exhibit 4 and ask you to describe this as compared with Exhibit 2 which you have just inspected. A. This lamp involves the structure described under '(b)' of the second page of the disclosure and in addition has a solid plate between the electrodes, such as is shown under '(a)' of page 2 of the disclosure.

"Q. 57. When and by whom was this lamp, Exhibit 4, made? A. This lamp is exactly similar to the lamps that were made by Dr. Marden and Mr. Nicholson in the early days of their experimental work on ultra-violet lamps, and I assume that it is one of the lamps made by them in the early part of 1930, such as they made before the date of their disclosure, which was April 30, 1930.

"Q. 58. State when, if at all, you have seen lamps exactly as here shown successfully operated for the production of ultra-violet light. A. I am quite certain I saw this lamp in successful operation before the date of signing this disclosure.

"By Mr. H. Price: Objected to as leading and calling for a conclusion.

"Q. 59. How many lamps of the type shown in Exhibit 4 were made and successfully operated? And when were they operated? A. It is difficult to state just how many were made, but I do know that a number of lamps embodying this general structure were made up and satisfactorily operated, and that—least several of

them were satisfactorily the date of the disclosure, Exhibit 2.

"By Mr. H. Price: Same objection.

"Q. 60. I hand you a lamp marked Marden and Nicholson Exhibit 6 and ask you to compare it with that of exhibit 4 and state the inventorship of this lamp, if you know it. A. Dr. Marden and Mr. Nicholson invented these lamps. The structure of the two is the same.

"By H. Price: Same objection.

*   *   *

"Q. 63. As director of Research, would you consider that the ultra-violet lamp development that you have discussed was a successful development or merely an experiment which was abandoned before the application was filed on November 19, 1931? A. It was a successful development as is borne out by the fact that many ultra-violet lamps with a discharge betweem hot cathodes were manufactured.

"By H. Price: Same objection as Q. 58."

We find no testimony in the record as to the successful operation by appellants of lamps embodying the structure of the counts, other than that hereinbefore quoted, prior to appellee's filing date.

Dr. Rentschler being the only corroborating witness with respect to reduction to practice of the invention by appellants, the question before us is whether his testimony is sufficient, together with the other evidence on behalf of appellants, to establish such reduction to practice.

It will be observed from the testimony quoted that in each of the questions propounded to this witness he was asked if the lamps were "successfully operated" or if the lamp was a "satisfactory development." There appears to be no reason why the facts upon which his conclusion was based should not have been brought out. True, they could have been brought out upon cross-examination; nevertheless, the burden was upon appellants to establish priority of invention, and it was their duty to establish facts upon which the conclusion of satisfactory operation was based.

It is true that Dr. Rentschler is an expert in the art, and that weight may sometimes be given to opinions of such experts without a detailed statement of facts upon which an opinion is expressed, such as would be required with respect to the opinion of one who is not an expert in the

art. Seeberger v. Russel, 26 App.D.C. 344.

However, there are circumstances in this case which lead us to the conclusion that the Board of Appeals did not err in holding that, notwithstanding the testimony of Dr. Rentschler, reduction to practice of the invention by appellants has not been established.

It will be noted from the testimony hereinbefore quoted that appellant Nicholson testified that the specific improvements over the prior art in appellants' device resulted in "Improved efficiency, greater life, greater amounts of ultra-violet radiation for a given amount of current." Of course, if any one of these results was secured by the operation of appellants' device, reduction to practice was accomplished.

If greater amounts of ultra-violet radiation were secured by the operation of appellants' device than were secured by the operation of lamps of the prior art for a given amount of current, the record shows that that fact could be definitely determined by measurements. The record fairly shows that a determination as to whether appellants' device had a greater life than lamps of the prior art was not made prior to the time that Dr. Rentschler testified he saw the lamps *successfully* operated, for appellant Marden testifies that lamps embodying the invention were put on life test about the end of July, 1930, and that such tests probably continued throughout the latter part of 1930. He also testified that the life tests "ran over a period of five hundred or one thousand hours." There is no testimony as to the result of this test; and even though it may be assumed that his testimony that the tests ran over a period of 500 or 1000 hours establishes that appellants' lamps had a longer life than lamps of the prior art, the testimony of the witness in that regard is not corroborated.

We agree with the Board of Appeals that tests of lamps embodying the invention were necessary to establish a reduction to practice.

It seems strange that, if such tests were made and were successful, a careful record of the same would not have been made by the Westinghouse company. We find no documentary evidence in the record of tests of lamps embodying the invention. In the report of appellants (Exhibit 2) to the Patent Department of the Westinghouse company (presumably one of the

real parties in interest here) which disclosed the involved invention, and which report was witnessed by Dr. Rentschler, it is stated: "These structures have been made and can be seen at any time."

Those in charge of the Patent Department must have appreciated the desirability of adequate tests of the invention in order to establish reduction to practice, but there is no record of such tests if any were made.

Another circumstance in connection with this matter is the fact that while the involved invention was reported by appellants to the Patent Department of the Westinghouse company on April 30, 1930, application for patent was not filed until November 19, 1931, or more than eighteen months after the disclosure of the invention to the Patent Department.

This would not be important had there been an actual reduction to practice of the invention by appellants, but it would seem that the Patent Department would have required some documentary evidence of reduction to practice before delaying so long in applying for a patent.

Of course this might all be explained on the theory that the Patent Department either did not believe that appellants' disclosure involved an invention, or believed that further tests were required to demonstrate the success of appellants' disclosure.

It is true that before the Patent Office tribunals appellants' counsel on the motion to dissolve the interference strenuously contended that the involved counts were not patentable over the prior art; or, in other words, insisted that neither party was entitled to a patent containing claims corresponding to the counts.

While not disposed to give great weight to the delay of appellants in filing an application for a patent, we think it is a circumstance proper to consider in weighing the testimony upon the question of reduction to practice of the invention at the time claimed by appellants.

The testimony relied upon by appellants to establish reduction to practice of the invention was given more than seven years after their claimed reduction to practice. We think some of our observations in the case of MacGregor v. Johnston, 71 F.2d 165, 168, 21 C.C.P.A., Patents, 1216, are applicable here. We there said:

" * * * This is not a case where an inexperienced individual inventor was struggling with the solution of a problem. The individuals connected with this controversy, upon both sides, were experienced experts in their respective lines of activity.

"When the record is considered as a whole, including the fact that, although the machine tested in Rexburg is said to have worked perfectly in August, 1925, the application for patent was not filed until September, 1926, and all the circumstances surrounding the parties and the occurrences are looked to, we do not feel that the junior party should prevail simply upon the arbitrary oral statements that the occurrences took place in 1925. The memories of men are too treacherous to admit of blind reliance upon them, and of all the records which it seems that the appellant, Johnston, might have produced in the way of documentary evidence, tending to support the alleged dates, nothing really helpful was produced. It seems to have been a case in which the effort was to see how little, rather than how much, could be proven."

As hereinbefore indicated, we are not satisfied that the Board of Appeals erred in holding that appellants have not established actual reduction to practice prior to appellee's entry into the field, or at any other time. The board was clearly right in holding that appellants had not established diligence in reducing the invention to practice from immediately prior to appellee's entry into the field to appellants' filing date, November 19, 1931, the latter being the date to which appellants are entitled for constructive reduction to practice.

For the reasons here stated, the decision of the Board of Appeals is affirmed.

Affirmed.