38 C.C.P.A. (Patents)

### PINES v. McALLISTER.

### Patent Appeal No. 5759.

United States Court of Customs and
Patent Appeals.

April 3, 1951.

Charles M. Thomas and M. M. Weisman, Washington, D. C. (M. P. Venema, Chicago, Ill., of counsel), for appellant.

Herbert L. Shepard, Chicago, Ill. (Edward B. Beale, Washington, D. C., of counsel), for appellee.

Before GARRETT, Chief Judge, and JACKSON, O'CONNELL, JOHNSON, and WORLEY, Judges.

JOHNSON, Judge.

On August 4, 1944, an interference was declared between the patent applications of Maryan P. Matuszak, No. 467,873, filed December 4, 1942, and Sumner H. McAllister, John Anderson and Walter H. Peterson, No. 428,656, filed January 29, 1942. The party McAllister et al. brought a motion to substitute the presently involved sole McAllister application, No. 606,475, filed July 21, 1945, for the joint application of McAllister et al. This motion was granted in a decision of the Primary Examiner dated December 14, 1945. At the same time that the interference was reformed to substitute the sole McAllister application for the joint McAllister et al. application, the party Pines' application No. 466,339, filed November 20, 1942, was added to the interference. As the interference was reformed, the party McAllister was made the senior party by virtue of according him the benefit of the filing date of the joint McAllister et al. application. A motion by the party Pines to shift the burden of proof was denied by the Primary Examiner. On April 23, 1948, the Board of Interference Examiners entered judgment against the party Matuszak by reason of his failure to take testimony within the time allowed for this purpose and said judgment became final. The Universal Oil Products Co. is the assignee of the Pines application, whereas the Shell Development

Co. is the owner of the McAllister application.

The parties McAllister and Pines submitted stipulated evidence in the form of affidavits and documentary exhibits. The case came on for hearing before the Board of Interference Examiners of the United States Patent Office and a decision was rendered on March 10, 1949, awarding priority to the senior party McAllister.

The party Pines alleged that on or about September 23, 1941, he first explained his invention to others, that on or about October 27, 1941, the first written description of the invention was made, and that the invention was reduced to practice on or about October 27, 1941. The issue before the board was simplified by counsel to the asserted reduction to practice of the party Pines, the board holding that no reduction to practice had been achieved, and consequently awarding priority to the party McAllister on the basis of his effective filing date, which preceded the Pines filing date by some ten months.

Since it was unnecessary to do so, the board did not mention any of the evidence presented for McAllister to prove a conception and reduction to practice prior to his effective filing date. Thus, if we should find that appellant has made out a reduction to practice as alleged, we should have to remand the case to the Patent Office for a consideration of the McAllister record. Brydle v. Honigbaum, 49 F.2d 963, 18 C.C. P.A., Patents, 1517.

The appellant's application in interference was filed November 20, 1942, while the effective date of filing of appellee's application is January 29, 1942. Appellee being entitled to the earlier date of filing, the presumption arises that he is the first inventor, Gallagher v. Hien, 25 App.D.C. 77, 68 L.R.A. 272, and the burden is thus on the appellant as junior party to establish priority of invention by a preponderance of the evidence, Anderson v. Walch, 152 F.2d 975, 33 C.C.P.A., Patents, 774.

As will appear from the sole count in issue, the interference relates to a process for producing high octane paraffins involving the combination of two steps or reactions. The first step consists of the catalytic isomerization of a 1–olefin to a corresponding 2–olefin. The final step is the utilization of the 2–olefin from the isomerization reaction to alkylate an isoparaffin in the presence of an alkylation catalyst. The alkylation of the 2–olefin in this manner produces a superior product, the alkylate containing a desirably high octane number when compared with alkylates obtained from the alkylation of a 1–olefin.

The sole count at issue reads as follows: "The improved process of producing high octane paraffins from an isoparaffin and a secondary 1–olefin, each having four to five carbon atoms per molecule, which comprises subjecting said 1–olefin to the isomerizing action of a catalyst capable of isomerizing said 1–olefin to the corresponding 2–olefin, and alkylating said isoparaffin with the resulting isomerization effluent in the presence of an alkylation catalyst."

Priority of invention is the sole issue, there having been no interlocutory motions filed upon which a review is here sought. Before us appellant makes the following contentions:

1. That the board erred in holding that the experiments conducted on behalf of Pines on October 13, 1941, failed to constitute a reduction to practice;

2. That the board erred in characterizing the stipulated testimony of Carl B. Linn as mere opinion evidence and in failing to accept such testimony as establishing the fact that isomerization of butene–1 to butene–2 did occur in the experiments of October 13, 1941.

Appellant's affidavits establish and appellee does not controvert the following facts. On October 13, 1941, Carl B. Linn, an employee of the Universal Oil Products Co. and a qualified expert in the pertinent art, in furtherance of a discussion with Pines, caused the following experiment to be carried out under his direct supervision.

160 cc. of UOP phosphosilicate polymerizing catalyst (diatomaceous earth and phosphoric acid) which had been previously treated by calcination at 800° F. to reduce its polymerization activity, was placed in the bottom of a glass tube. About 500 cc.

of Alorco alumina were then added to the glass tube to form a second layer of catalyst on top of the phosphosilicate catalyst. The glass tube was thereafter placed in a furnace and secondary butyl alcohol passed downwardly through the beds of solid catalysts at a temperature of about 350° C. and a charging rate of 250 cc. per hour. The Linn affidavit stated that the purpose of this experiment was to produce butenes for subsequent use in the alkylation of isobutane with isobutene, butene–1, and butene–2, as was suggested by Pines to Linn.

An analysis of the product produced in the above experiment showed that it contained 93.8% n–butylene, which was broken down into 16.3% butene–1 and 77.5% of butene–2. Also reported was 4.0% isobutene (isobutylene). No sample of the material was removed from the space between the upper layer of Alorco alumina and the lower layer of the phosphosilicate catalyst for analysis to determine the composition of the reacted material at that stage. Some of the collected material was ultimately reacted with isoparaffin and the reaction product tested and given an octane rating which was deemed to indicate that the process gave satisfactory results from the point of view of the finished product.

It is agreed between opposing counsel that the sole question before us for review is whether the board committed error in failing to find an actual reduction to practice by Pines on the basis of the experiments conducted in October and November of 1941. Actually the question for decision is further narrowed to the determination of whether or not the board committed error in holding that the record for Pines failed to sustain his burden of proof with respect to the carrying out of the first step of the count, i. e., the isomerization of butene–1 to butene–2, prior to employment of the olefin as alkylation feed.

McAllister does not question the fact that, in the 1941 experiments, Pines produced an alkylate comprising high octane paraffins by the alkylation of isobutane with butene–2. McAllister does contend, however, that Pines did not obtain the butene–2 for his alkylation runs by isomerization of butene–1, as required by the count, but by

the dehydration of secondary butyl alcohol, an operation which does not satisfy the first step of the count. It is McAllister's further contention that, at the least, the Pines evidence is insufficient to sustain his burden of proving that the isomerization step was actually carried out.

The preliminary Pines experiment, hereinbefore set forth, consisted of two distinct reactions, the first being that effected as the secondary butyl alcohol passed over the Alorco alumina, and the second being that effected as the product of the first reaction passed over the phosphosilicate catalyst. Both parties agree that the first reaction comprised the usual manner of preparing butylenes and that the reaction resulted in the dehydration of the secondary alcohol to form a mixture of butene–2 and butene–1. The parties disagree as to what occurred in the second reaction and therein lies the crux of the case. If it be found that appellant has offered a preponderance of evidence to prove that isomerization occurred, then the case must be remanded to the Patent Office for a consideration of appellee's evidence. If, contrariwise, it be found that appellant has not preponderantly proved that isomerization did occur, then priority must be awarded to the appellee on the basis of his date of constructive reduction to practice.

As has been stated, no sample of the material was removed from the space between the upper layer of alumina and the lower layer of phosphosilicate catalyst, and consequently no analysis of the material was made at that point to determine quantitatively the effect of the phosphosilicate catalyst. Pines relies instead upon the testimony of Linn that he "knew" at the completion of the experiment that isomerization had occurred.

The Linn testimony as to the two reactions reads as follows (Exhibit Nos. omitted): " * * * We [Pines and Linn] *knew*, from the prior art, and from information, both oral and written, given to us by our associates, that Alorco Alumina would effect the dehydration of secondary butyl alcohol to a mixture of butene–1 and butene–2. Two of our associates, Drs. V. N. Ipatieff and B. B. Corson, had previ-

ously produced a mixture of butene–1 and butene–2 in the same way and published the data in Industrial and Engineering Chemistry, Vol. 27, pages 1069–70, September, 1935. We also *knew* that the phosphosilicate catalyst would effect the isomerization of a substantial portion of the butene–1 to butene–2 *because of* some earlier work conducted by Pines, Ipatieff and Schaad and published by them in 1934 in Vol. 56, page 2696 of the Journal of the American Chemical Society in which butene–1 was isomerized to butene–2 in the presence of a catalyst consisting of diatomaceous earth and phosphoric acid. * * *" [Italics ours.]

Linn further testified: "As previously stated, both Pines and I, from our knowledge of the prior art and information, oral and written given to us by our associates, *knew* that the alumina would, under the conditions used, effect the dehydration of the secondary butyl alcohol to a mixture of butene–1 and butene–2. In the experiment described above, the alumina catalyst layer was used for this purpose and I *knew* that in this experiment this reaction was effected." [Italics ours.]

And as to the effect of the phosphosilicate catalyst layer: "As previously stated, both Pines and I *knew* that the phosphosilicate catalyst would isomerize butene–1 to butene–2 and the phosphosilicate catalyst layer was used for the purpose of isomerizing the butene–1 to butene–2 and I *knew* upon completion of the experiment on October 13, 1941 that this reaction had been effected. * * *" [Italics ours.]

The appellant Pines testified: "It was also decided during this same discussion that the product from the dehydration step should be passed over a catalyst consisting of diaomaceous [sic] earth and phosphoric acid which I *knew*, on the basis of early work, was an effective catalyst for isomerizing butene–1 to butene–2. In 1935, two of my associates, Ipatieff and Schaad and myself published data we had obtained employing a catalyst consisting of diatomaceous earth and phosphoric acid for isomerization of butene–1 to butene–2. The data were published in 1934 in 'Vol. 56 p.

2696 of the Journal of the American Chemical Society' * * *" [Italics ours.]

In 1947, when the subject interference was in condition for the taking of testimony, the party Pines caused an additional experiment to be made under Linn's supervision, allegedly "to confirm the facts as recited by Pines and Linn concerning the isomerization reaction that occurred during the October 1941 experiment."

In the "confirmatory" test the original experiment was duplicated save that the solid phosphoric acid catalyst layer was omitted and the secondary butyl alcohol was merely dehydrated over Alorco alumina. Analysis of the product showed that it contained 30.4% butene–1 and 63.7% butene–2. Merely a trace of isobutene was detected. Comparison of these yield figures with those of the original experiment indicates an increased yield of butene–2. From this Linn made the following conclusion as to the original experiment: " * * * It is apparent from these data that about 46.5% of the butene–1 isomerized to butene–2 during the passage of the product of the dehydration step through the bed of phosphosilicate catalyst used in the experiment shown in Exhibit 1."

If appellant is to prevail we must find that the foregoing proves by a preponderance of evidence that isomerization did in fact occur. We do not so find.

The documentary evidence in the record pertaining to the experiment of October, 1941, is completely devoid of any mention of isomerization of butene–1 to butene–2. No documentary data appears which would necessarily lead to that conclusion. In the final report (Pines' Exhibits Nos. 17, 18, 19 and 20) on the entire experiment, Linn wrote the following: "A comparison of results from 1–butene and 2–butene shows the latter to produce a definitely superior alkylate as regards octane number, amount of aviation cut, and in freedom from bound fluorine. * * * However, the superior product obtained from 2–butene indicates that it *may be desirable* to process the charging stock so as to isomerize the 1–butene into 2–butene, which can be done by passing over certain acid catalysts such as

phospho-silicate under milder conditions than produce polymerization. * * *" [Italics ours.]

Clearly the statement "it may be desirable * * * to isomerize the 1–butene into 2–butene" is not *proof* that such reaction was effected, *nor indeed is it even a statement that it occurred.* Lacking documentary data which would prove that isomerization did occur, appellant must rely upon his own and Linn's stipulated statements made some seven years later, that they *knew* at the time that isomerization had taken place.

Both Pines and Linn spoke as experts in testifying that they knew that isomerization had occurred. Linn testified that he knew the isomerization reaction would occur "because of some earlier work conducted by Pines, Ipatieff and Schaad and published by them" in the Journal of the American Chemical Society. Pines testified that he knew the same thing "on the basis of early work," which he identified as the material published in the Journal of the American Chemical Society, supra. This material was Pines' Exhibit 24.

Exhibit 24 comprises data which shows that the isomerization of butene–1 to butene–2 over diatomaceous earth impregnated with phosphoric acid, under pressure, increases with an increase in temperature from 100° C. to 249° C., until at 249° C. the product is substantially pure butene–2. No data appears for temperatures above 249° C.; yet Pines and Linn, basing their conclusion upon this information, "knew" that isomerization occurred *in the instant experiment* where the temperature was 350° C., 101° higher than the highest temperature reported in the prior work.

Pines' specification further states, and we must accept the statement as true, or at least accord it probative value equal to that of his affidavit, In re Forstrom, 111 F. 2d 181, 27 C.C.P.A., Patents, 1160, that: "* * * When using a solid phosphoric acid type catalyst, the conditions chosen will depend upon the particular isomerization reaction which is desired. For example, *at temperatures of 250° C. and higher,* a pressure of less than 5 atmospheres, and a contact time of less than 1 minute,

*normal butenes are converted to isobutene.* However, *at temperatures below 250° C.* and with considerably longer contact times, *the conversion of butene–1 to butene–2 is the predominant reaction."* [Italics ours.]

Appellee, pointing out this passage of the Pines specification, urges that in all probability the effect of the phosphosilicate catalyst in the 1941 experiment was to convert the normal butenes to isobutene as the specification indicates would happen under the conditions used. The presence of 4% isobutene in the product of the 1941 experiment, when compared to the mere trace produced by the 1947 experiment, lends credence to this contention.

Both Pines and Linn in testifying as to the purpose of the Alorco alumina referred to prior published data on the dehydration of secondary butyl alcohol, which data was made Pines' Exhibit 23. This publication showed that at temperatures between 375° C. and 425° C., secondary butyl alcohol passed over activated alumina yielded a 50–50 mixture of butene–1 and butene–2. The 1947 experiment, conducted under similar conditions, yielded a 30.4–63.7 mixture of butene–1 and butene–2. Yet the witness Linn testified that the increase in butene–2 yield in the 1941 experiment over that of the 1947 experiment was due to isomerization of butene–1 to butene–2. While it may well be that the change in yield was due to isomerization, it is clear that the comparison of the yield figures does not inevitably lead to that conclusion. On the basis of all the yield figures it would be equally plausible to conclude that the split of butene–1 and butene–2 over alumina varies widely and that the 1941 experiment merely showed another resultant proportion.

While appellant has produced evidence which shows that isomerization might have occurred in his 1941 experiment, the record also contains evidence which could as easily support the opposite conclusion. Clearly appellant has not proved his case by a preponderance of the evidence.

As hereinbefore stated the testimony in this case was in the form of stipulated affidavits. The stipulation provided that were the various affiants called as witnesses, they would testify as set forth in the respective

affidavits and that the affidavits would have the same force and effect as testimony regularly adduced.

Appellant now contends that because the testimony was stipulated and because appellee offered no rebuttal testimony we must accept the Linn statement that he "knew" isomerization had occurred as a stipulated fact. The cases of Bijur v. Bendix, 52 App.D.C. 240, 285 F. 974, 975, and Draeger v. Bradley, 156 F.2d 64, 33 C.C.P.A., Patents, 1130, are urged upon us as compelling such a conclusion. We cannot agree that they do.

In Bijur v. Bendix, supra, the appellant conceded and the record unquestionably established, that six witnesses in addition to the appellee testified to the actual reduction to practice of the appellee's invention. Appellant in that case took no testimony and produced no evidence, but contended that all seven witnesses perjured themselves. The testimony being consistent and there being no basis whatsoever for rejecting it, the court stated:

\* \* \* A careful scrutiny of the record satisfies us that there is no basis whatever for rejecting the testimony of Bendix's witnesses. No court is at liberty to refuse credence to the testimony of witnesses unless there is something in the record upon which to rest the refusal.

Appellee McAllister neither traverses *facts* in appellant's affidavits, nor urges that the testimony was perjured, but he does controvert the *conclusion* drawn from apparently *conflicting* evidence *on the record.* Plainly the Bijur case is not in point.

In Draeger v. Bradley, supra, there was a stipulation of the type present in the case before us. Draeger et al., presenting no testimony of their own, contested the stipulated testimony of Bradley's witnesses and this court held that having stipulated, they were bound by the testimony. There, however, the witnesses testified that Bradley had disclosed certain subject matter to them at a particular time. This was *factual* testimony, as to the actual acts of Bradley, in marked distinction to the *opinion* testimony disputed in the instant case.

The party Pines and his witness Linn testified as to certain matters of fact (disclosure dates, tests and experiments). They also testified that they "knew" on the basis of prior art, at least part of which is of record, that certain steps in these factual experiments would produce and had produced certain results. The party McAllister has contested, not the facts, but the conclusions, and it is our opinion that he is completely free to do so.

The controlling law is set forth in the cases cited by the board, Chandler v. Mock, 150 F.2d 563, 567, 32 C.C.P.A., Patents, 1183, and Marden v. Braselton, 119 F.2d 174, 183, 28 C.C.P.A., Patents, 1077.

In the case of Chandler v. Mock, supra, an eminently qualified expert testified as to the successful operation (reduction to practice) of the Chandler device on the basis of having observed the same and on the basis of records of the test which *did not of themselves show whether the operation was successful.* The court there stated: "While a witness in a court of justice is not to be disparaged because he has won renown in his field of endeavor, nevertheless his reputation cannot be utilized to cover a deficiency in evidence."

In Marden v. Braselton, supra, an expert testified that a device was a "satisfactory development" and had been "successfully operated." In affirming the board's holding that reduction to practice had not been established we there said: "\* \* \* There appears to be no reason why the facts upon which his conclusion was based should not have been brought out. True, they could have been brought out upon cross-examination; nevertheless, the burden was upon appellants to establish priority of invention, and it was their duty to establish facts upon which the conclusion of satisfactory operation was based."

While it is true that weight may be sometimes given to opinions of experts without a detailed statement of facts upon which an opinion is expressed, Seeberger v. Russel, 26 App.D.C. 344, there are facts of record in this case which would at the least cast serious doubt upon the conclusions which have been drawn.

The record here submitted fully warrants the holding of the Board of Interference Examiners that appellant has failed to prove reduction to practice by a preponderance of the evidence.

For the reasons stated, appellee is entitled to an award of priority and the decision of the Board of Interference Examiners is affirmed.

Affirmed.