## PAYNE v. HURLEY.
### Patent Appeal No. 3310.

Court of Customs and Patent Appeals.
June 12, 1934.

Harry A. Yerkes, Jr., of New York City (Lee B. Kemon, of Washington, D. C., of counsel), for appellant.

Border Bowman, of New York City (Nathan, Bowman & Helferich, of New York City, of counsel), for appellee.

Before GRAHAM, Presiding Judge, and BLAND, GARRETT, and LENROOT, Associate Judges.

GRAHAM, Presiding Judge.

An interference was declared between a patent issued to the appellant, Hugh F. Payne, No. 1,793,130, issued upon an application, No. 448,893, filed May 1, 1930, and an application of the appellee, Roy T. Hurley, Serial No. 435,461, filed March 13, 1930, for a similar invention.

The subject-matter of the invention is expressed in one count which is as follows: "In a spark plug, the combination of a body piece having a central opening, a metallic quill passing through said opening, an insulating sleeve surrounding the quill, and a central metallic spindle driven into the quill so as to expand the same to grip the insulating sleeve against the surrounding surface of the opening in the body piece."

The Examiner of Interferences awarded priority of the subject-matter in controversy to the senior party, Hurley, which decision was afterwards affirmed by the Board of Appeals, and from which latter decision Payne has appealed.

The Examiner of Interferences made a finding of conception by Payne in 1927, but of no reduction to practice by him until his constructive reduction to practice on May 1, 1930. He further found that there had not been diligence by the party Payne from the time of filing of Hurley's application on March 13, 1930, until the filing of the Payne application on May 1, 1930.

The examiner was also of the opinion that Payne's work on his alleged invention was an abandoned experiment. The Board of Appeals expressed the same views as the Examiner of Interferences as to conception and reduction to practice, but concluded that it was unnecessary to pass upon the question of whether Payne's work did or did not amount to an abandoned experiment.

The issue was simplified somewhat before the Board of Appeals, in that the party Payne did not there allege error in the finding of the examiner of lack of diligence from the time of Hurley's application to that of his own application.

In this court the issue is the same. But one question is argued by counsel, namely: Was the invention which Payne conceived in 1927 reduced to practice by him at that time? It is conceded that if it was not so reduced to practice, he did not exercise proper diligence during the period between the two applications. Some showing is made that during 1928 a drawing was made, but there is no serious contention that this has any bearing on the issues.

The subject-matter of the invention was a spark plug, and the sole question is: Were the tests used by the party Payne and his co-workers sufficient to establish a reduction to practice? All the tests which were made, and upon which the party Payne relied, were made at or about the time of the construction of a complete plug by Payne and his helpers in 1927.

The party Payne was employed by the Brewster-Goldsmith Corporation on March 1, 1927, to be in charge of experimental work. This corporation was, and had been for some time, engaged in the manufacture of mica spark plugs for automobiles and aeroplanes, about 95 per cent. of its production being for aviation work. It was desired to produce an improved radio shielded spark plug, principally for use in aeroplanes, and Payne undertook such work. The plugs previously sold by this company, designated as "Midget" and "Hornet" models, had been manufactured and used, but it was desired to improve them. The testimony shows quite clearly that Payne, between March 1 and May 1, 1927, conceived

and caused to be made a spark plug embodying the principles and structure afterwards disclosed in Payne's patent here in issue. The work was done by one of Payne's mechanics, John Falk, in the works of the Brewster-Goldsmith Corporation. Corroboration of the making of this plug is furnished by Falk, Dillner, supervising foreman, and Paulson, chief engineer, of the corporation.

The Payne plug was constructed upon the principles embodied in the count of the issue here. In its construction, a central spindle with two diameters, one illustrative form having a diameter at one end of .125 of an inch and .133 of an inch at the other end, is driven or forced by pressure into a copper cylinder or quill, so that it fits snugly, and in a manner intended to be gas proof. The quill is inclosed by an insulating sleeve of mica rolled up, commonly alluded to as a cigarette, and the spindle thus enclosed is, in turn, inclosed in a structure consisting of a bushing and insulating portions of built up mica plates. The sparking between the electrodes is within the base of the plug, in an opening or recess thereof, intended for a shield.

The witness Paulson testified that he directed Payne to test the model plugs out experimentally, and Payne testified that he did so. Part of his testimony, on this subject, was as follows:

"Q48. Will you now please describe the tests that were made? A. The tests were in the nature of laboratory tests and consisted of testing the spark plug for sparking under air pressure. Further tests were made to determine the air leakage of the spark plug. Tests were also made to determine the effect of repeated heating and cooling to see if this had any influence upon the loosening of the components of the spark plug.

"Q49. Can you amplify your answer by stating of what the tests consisted? A. For testing the spark plugs for sparking under air pressure, a testing bomb of well-known construction was used. The plugs are screwed into a pressure chamber and subjected to 100 pounds air pressure in this particular test. Then current from a magneto is passed through the spark plug. The test for air leakage consists of applying air pressure to the open end of the spark plug while the plug is immersed in water. The heating and cooling tests are made by alternately heating the plug in a gas flame and permitting it to cool.

"Q50. What can you say as to the result of the tests? A. Being experimental plugs,

a certain percentage were defective, but on the whole the tests were satisfactory."

It is admitted that these were the only tests which were applied to the plugs in question. No attempt was made to put them in an engine, or to operate them under ordinary working conditions in such an engine. The witness Falk testified that he tested these plugs as follows:

"Q34. Will you please describe the tests you made? A. We have a fixture that you set the plug into; if the plug is dead, there will be no spark; if it is alive, it will jump. That is the only test.

"Q35. Can you state to the best of your recollection when you made that test? A. That is pretty hard. As soon as I finished a plug, I tested it and turned it over.

"Q36. How many plugs did you test that way, do you recall? A. I tested two plugs.

"Q37. Two complete? A. Two complete units.

"Q38. And what was the result of the test? A. All right.

"Q39. Was the test that was made the usual test made by the B. G. Corporation of its spark plugs? A. Yes."

The witness Dillner testified that he was present at the time of the testing, "but paid no attention. Mr. Payne was new and it was his idea." Again, he stated: "I saw Mr. Payne test the models, but what the result was I couldn't say."

We find no other testimony in the record which might be relied upon as proof of the testing of these plugs. From the time this work was done until the party Payne filed his application in May, 1930, we find nothing in the record which shows any further attempt to reduce the subject-matter of this invention to practice, or which tends to show any further work of any kind upon this invention.

Counsel for the appellee contends that what Payne did in the way of tests, as heretofore recited, is not sufficient to establish a complete reduction to practice; that a spark plug, especially of the construction of that here involved, must be tested under actual working conditions in an engine; and that shop or laboratory tests, such as were used by Payne, are not sufficient. On the other hand, counsel for the appellant as vigorously argue that a spark plug is of simple construction, that the tests imposed were the usual

ones used by the trade, and that they were sufficient to establish reduction to practice.

In this connection, the witness Edward V. Lobus, called by the appellee, a mechanic skilled in the art of making spark plugs, testified that in his experience spark plugs which had satisfactorily passed bench tests were often found to be defective on engine tests. The witness Du Bois, experimental engineer, testified that a shop test was not sufficient, stating, in part, as follows: " * * * The actual operation of the plug in an engine imposes a combination of mechanical, electrical and thermal stresses upon it, which, to my knowledge, have never been duplicated in the so-called bench tests. The presence in the fuels marketed today of such compounds as tetraethyl lead give rise to deposits of lead bromide and other chemical compounds on the spark plug which are considered by many to be damaging in their effect upon the plug."

The party Hurley also testified that shop tests were not sufficient for spark plugs, and that frequently plugs which would test satisfactorily in bench tests would not be satisfactory in an engine. Payne, himself, indicated some doubt as to the sufficiency of the test, which is shown by the following question and answer:

"Q51. Well, can you describe in more detail what you mean by the term 'satisfactory'? A. By 'satisfactory' I mean that the plugs gave every indication that they would be suitable for use in an internal combustion engine as well as can be established by laboratory tests, which tests followed the same routine as the regular production tests used in the factory."

We are convinced that the Board of Appeals was not in error in finding, upon this record, that the party Payne had not proven actual reduction to practice prior to his filing date. The spark plug which he had invented was not such a device as can be conclusively presumed to be operable by an inspection of it, or by tests other than that of actual operation under ordinary working conditions. The products which are ordinarily held to be successfully reduced to practice, without an actual test under working conditions, are oftentimes in the chemical field. This was true in Corona Cord Tire Co. v. Dovan Chemical Corp., 276 U. S. 358, 383, 48 S. Ct. 380, 387, 72 L. Ed. 610, and in Wietzel v. Lacy, 39 F.(2d) 672, 17 C. C. P. A. (Patents) 943. In the Corona Case, the Supreme Court, quoting Walker on Patents, par. 141a, said: " * * * A process is reduced to practice when it is successfully performed. A machine is reduced to practice when it is assembled, adjusted and used. A manufacture is reduced to practice when it is completely manufactured. A composition of matter is reduced to practice when it is completely composed."

In some cases of simple inventions it has been held that the mere construction of the article demonstrates its operability and that no test under actual working conditions is required. Wilcox v. Danner, 53 F.(2d) 711, 19 C. C. P. A. (Patents) 802; Buchanan v. Lademann, 54 F.(2d) 425, 19 C. C. P. A. (Patents) 836; Mason v. Hepburn, 13 App. D. C. 86; Couch v. Barnett, 23 App. D. C. 446; Schartow v. Schleicher, 35 App. D. C. 347; Gaisman v. Gillette, 36 App. D. C. 440.

We held, in Brydle v. Honigbaum, 54 F. (2d) 147, 19 C. C. P. A. (Patents) 773, that the construction of a panel of asbestos shingles was a sufficient reduction to practice of the shingles. In that particular case, the panel had been constructed and fastened upon the outside of a warehouse in a sloping position, similar to that of a roof. Inasmuch as similar shingles had been long used, and their composition and wearing ability were well known in the art, this court was of the opinion no further reduction to practice was necessary.

However, the spark plugs here involved are not in the same class. They were of a comparatively new type and when in use are exposed to working conditions which place a most severe strain upon them. These plugs, it is shown, must have spindles of sufficient compression strength not to lose their shape under combustion conditions. They must be capable of withstanding the high temperatures and pressures in the cylinders of automobile and aeroplane engines. They must have a gas-tight seal and complete electrical insulation. The plugs were small in size, and hence additional care was required to be used to secure their safe construction. Especially was this true when such plugs were used in the engines of aeroplanes. The testimony of the witnesses shows, and we think it apparent from the facts presented by the record, that no manufacturer of automobiles or aeroplanes would use spark plugs which had been subjected only to bench or shop tests, and which had never been used under actual working conditions. Many cases might be cited in which the courts have expressed their views that inventions must be reduced to practice by subjection to actual working conditions. A few only are noted:

This court, in James v. Stimson, 49 F.

(2d) 493, 18 C. C. P. A. (Patents) 1255, held that a highway danger signal, consisting of a device with reflecting surfaces adapted to catch and reflect the rays of light from automobile headlights, must be tested upon a highway, under actual working conditions, to be reduced to practice.

In Barcley v. Schuler, 41 App. D. C. 250, a wire garment stay formed of a single wire bent in alternately progressive loops, adapted to be used in the manufacture of a corset, was held to necessarily require a test under actual working conditions.

In Jobski v. Johnson, 47 App. D. C. 230, a device, part of a means used in retaining an automobile tire on its rim, was held not to be sufficiently tested by shop tests, but must be tested by use upon a car in motion.

In Fageol v. Lyon, 53 App. D. C. 361, 290 F. 336, the court held, speaking through Smith, Judge, of this court, that certain hook bolts used to secure a bumper to an automobile frame were not sufficiently tested by pulling and jerking the bumper, but must be tested upon the road, where they would be subjected to the strains occasioned by the inequalities and conditions of the road.

The same court, in Crabbs v. Wardell, 57 App. D. C. 241, 19 F.(2d) 715, in an opinion by Martin, Chief Justice, formerly of this court, held that an invention of prepared roofing, involving a combination of asbestos and cattle hair, impregnated with an asphaltic waterproofing compound, must be tested by experimentation under varying weather conditions, in order that it be successfully reduced to practice.

Our most recent expression on this subject is found in Fink v. Humel, 70 F.(2d) 115, 21 C. C. P. A. (Patents) ——, in which we held that a metal strip for use in laying a terrazzo floor was reduced to practice only by use under actual working conditions.

We are of opinion that the party Payne has shown no actual reduction to practice. There being no contention that he exercised diligence during the critical period after Hurley's filing, it follows that the party Hurley was properly awarded priority. The other questions raised before the Patent Office tribunals, not being necessary to a decision here, will not be discussed.

The decision of the Board of Appeals is affirmed.

Affirmed.

HATFIELD, Associate Judge, did not participate.