## MacGREGOR v. JOHNSTON.
## JOHNSTON v. MacGREGOR.
### Patent Appeal Nos. 3312, 3313.

Court of Customs and Patent Appeals.
June 12, 1934.

Fisher, Clapp, Soans & Pond, of Chicago, Ill. (Cyril A. Soans, of Chicago, Ill., of counsel), for MacGregor.

Henry P. Doolittle and Paul O. Pippel, both of Chicago, Ill., for Johnston.

Before GRAHAM, Presiding Judge, and BLAND, GARRETT, and LENROOT, Associate Judges.

GARRETT, Associate Judge.

These are cross-appeals from a decision of the Board of Appeals of the United States Patent Office, awarding priority to the party MacGregor upon one count, involved in an interference, and priority to the party Johnston upon the other eight counts so involved. In the decision of the Examiner of Interferences MacGregor was awarded priority on all the counts, numbered 1 to 9 consecutively, but the Board reversed as to all except count 1.

Count 1, priority upon which stands awarded to MacGregor, reads:

"Count 1. In a machine of the class described having a harvester part foldable rearwardly in a horizontal plane, a fixed grain wheel supporting the harvester in its normal cutting position, and means whereby the same wheel may support the harvester in its fold-

ed position and function as a trailing caster wheel."

Of the eight counts upon which priority stands awarded to Johnston, count 7 is regarded as fairly representative:

"Count 7. In a machine of the class described, a thresher, a harvester, a support for the harvester, means connecting the support to the thresher for folding the harvester alongside the thresher, a caster-wheel supported by the harvester, and detachable means for locking the wheel to the support to position and maintain said wheel for rotation in the direction of travel of the harvester during cutting operations and for unlocking the wheel to swivel as the harvester is being folded and while traveling in folded position alongside the thresher."

The counts relate to alleged improvements in a combination harvester and threshing machine, commonly referred to as a "combine." Although general use of such machines is understood by us to be of comparatively recent development, it was stated, during the argument, that a patent for a device involving the "combine" idea was granted almost, or quite, a century ago.

In these machines the thresher unit is placed upon a platform mounted on wheels. The harvester portion, included in which is the header, is attached at a side of the threshing unit. As the combined machine is drawn through the grain field, the heads of grain, with as little of the straw as possible, are cut by the harvester blade and by means of an endless belt, or the like, delivered into the thresher where it is threshed, the threshed grain being conveyed into a receptacle carried on or about the platform, from which receptacle it is withdrawn from time to time as desired.

The harvester part is connected with the threshing unit flexibly, so that it may be folded rearwardly alongside the thresher and thus, when being transported, or when stored, occupy less space than when in operation in the field. At the outer end of the blade-carrying element, or header, there is a wheel which supports the element. This is known as the grain wheel. When the device is in operation, the grain wheel is in fixed position rotating along a relatively fixed line in the direction of travel of the harvester. When the machine is being transported with the harvester part folded rearwardly, it is desirable to have, at the end of and supporting the header, a wheel which will caster. It seems that formerly it was the practice to change wheels for the accomplishment of the respective ends of cutting and transporting.

The improvement here involved relates to a combination including means whereby the wheel may be locked in position to serve satisfactorily as a grain wheel during the cutting operation, and unlocked so that it will swivel and serve as a caster-wheel during transportation.

The MacGregor appeal, being first in its docket number, will be first considered.

MacGregor is the senior party, his application, serial No. 85,197, having been filed February 1, 1926. The application of Johnston, serial No. 134,992, was filed September 13, 1926.

The original preliminary statement of MacGregor alleged conception on, or about, November 21, 1925; explanation of the invention to others on, or about, November 21, 1925; the making of drawings on, or about, November 27, 1925; completion of a full size machine on, or about, February 24, 1926, and successful operation on, or about, February 26, 1926. It also states the manufacture and sale by MacGregor's assignee of 250 machines up to the time of the filing of the statement, November 17, 1930.

Subsequently MacGregor was permitted to file an amended preliminary statement, but this affects only count 1, priority upon which was awarded to him, and this action will not be here discussed.

Johnston's preliminary statement alleges conception on, or about, July 1, 1925; first explanation to others on, or about, July 1, 1925; the completion of a full size machine on, or about, August 1, 1925; and successful operation thereof "on or about the 7th day of August, 1925, or shortly thereafter." It states that Johnston's assignee had manufactured several hundred machines "for use and sale."

### Counts 2–9, Inclusive.

The controversy with respect to counts 2–9, inclusive, is solely one of fact, the question being whether Johnston actually reduced to practice in 1925, as he alleges. The Examiner of Interferences held the evidence introduced on behalf of Johnston insufficient to show reduction to practice by him at any time prior to MacGregor's filing date. He further held that there was no definite evidence as to any activity on the part of Johnston during the first half of 1926 and that Johnston, therefore, had clearly failed to show diligence after MacGregor entered the field. The Board of Appeals holding the evidence to be sufficient to show reduction to practice at Rexburg, Idaho, in August, 1925, found that Johnston had reduced to practice prior to MacGregor's claimed date of conception.

It resulted that neither of the tribunals of the Patent Office found it necessary to discuss MacGregor's proofs, and no specific dates other than (by implication) the filing date, are awarded MacGregor in either decision.

It may be stated that, at the time of his alleged invention, Johnston was director of engineering of the International Harvester Company, the assignee of his application, and MacGregor, at the time of his alleged invention, was a mechanical engineer for J. I. Case & Co., the assignee of his application.

All the evidence on behalf of both parties was taken in the year 1931, or some six years after Johnston's claimed dates.

Since the decisions of the tribunals of the Patent Office as to counts 2 to 9 are in direct conflict upon the question of fact, it has been necessary for this court to examine the evidence with much care—particularly that introduced on behalf of Johnston. In so far as questions of fact are concerned, there is no serious controversy with respect to the evidence on behalf of MacGregor.

Johnston, in his testimony, claims that he conceived the invention about June 15, 1925, during field trials of harvesting machinery which took place in that month in the vicinity of Hutchinson, Kan.; that it was the custom of himself and others of the engineering executives of his company to attend the trials at Hutchinson which were held annually; that several of his associates were present with him, among them being Messrs. Arthur Johnson, C. R. Crumb, and Lee Millard, all of whom subsequently testified in the case; that he discussed the invention at the time with persons there at Hutchinson; that they returned to Chicago some time between the 25th of June and the 5th or 6th of July, 1925; that "in accordance with custom," upon the arrival of the engineering executives at Chicago, the operating engineering department was instructed to proceed with the design and development of a machine incorporating the invention; that one A. L. Johnson was instructed to proceed with the work and "to send Messrs. Charles Crumb and Lee Millard down to * * * office to attend a conference where they would receive full instructions"; that they attended, returned to the works, and "proceeded to make layouts of this construction"; that the conference occurred at the office of a Mr. A. C. Lindgren, one of the engineering execu-

tives; that there were present beside himself and Lindgren, Messrs. C. R. Raney, Arthur Johnson, C. R. Crumb, and Lee Millard; that a drawing was made as a result of the conference; that a machine, known as "Harvester Thresher No. 57," was made up and, in August, 1925, shipped by express to Rexburg, Idaho, where it was assembled by himself and others, naming a Mr. Willis, C. R. Raney, A. L. Johnson, and A. E. McKinstry; that arrangements were made with a farmer who was operating a farm approximately twelve miles from Rexburg to come in and haul the machine out to his farm; that at places the roads were so narrow that the machine had to be hauled; that as it went forward (we assume meaning under its own power) the transportation features, including the "caster carrying wheel," performed entirely satisfactorily; that after being operated in the vicinity of Rexburg in August, 1925, the machine was returned "with other experimental machines" to the Deering Works in Chicago, "and after it had been preserved a sufficient length of time to serve our purpose, it was destroyed."

Johnston further testified that his wheel construction was embodied in a machine known as "the No. 9" made in November or December, 1925, and later "put into regular production." One of these seems to have been shipped to South America. No use of it was shown, and there is no reliance upon it for reduction to practice.

It is said by the Board of Appeals that Johnston's application drawings correspond with the "November machine rather than with the machine tested in August and September," but the Board held that the drawings claimed to have been made in July, 1925, for construction of the device claimed to have been tested at Rexburg, disclosed the invention.

Certain photographs of "the No. 9" machine were introduced in evidence. Their relevancy and admissibility will be later discussed.

The foregoing is, we feel, a fair statement of the substance of Johnston's testimony, and upon various points there is corroboration by the witnesses Crumb, Millard, Hrizak, McKinstry, and Arthur Johnson. We shall not attempt detailed paraphrases of their evidence.

As we view the case, the serious question is whether Johnston has satisfactorily established that the occurrences testified to took place in 1925 rather than in 1926. We do not overlook the fact that he is not required to prove his case beyond a reasonable doubt, but only by a preponderance of the evidence. But has he succeeded in producing satisfactory evidence which, in any proper meaning of the word, preponderates?

The Examiner of Interferences made a most careful and critical analysis of the evidence, and forcefully pointed out the absence of proof as to many relevant matters and the failure to explain why such proof was not offered.

Johnston contented himself with showing by the oral testimony of himself and fellow employees of the actual party in interest— International Harvester Company—the occurrences at Hutchinson, Kan., and at Rexburg, Idaho. That these occurrences took place we do not doubt, but in what year?

It was the custom of the engineering executives of the International Harvester Company to go annually to Hutchinson for the trials of harvesting machinery, and the witnesses who went to Rexburg were not even asked whether they were there in any other year than 1925.

They were testifying at a period long after the occurrences. As an aid to their memories relative to when the occurrences took place, they cited no events or incidents of moment—indeed nothing material save some expense accounts for the trips. These accounts were not introduced in evidence, the witnesses simply having looked at them to refresh their memories, and the meager evidence respecting them is quite unsatisfactory. The record does not disclose that any item of the expense accounts actually related to the machine itself and not even the date when the accounts were filed is shown. One of the witnesses does say that his memory of the whole job of designing the machine was refreshed by thinking over the things that happened that year, they being "extraordinary" in his experience, but he does not state what the "things that happened" were, nor why they were "extraordinary." The farmer at Rexburg, Idaho, who was employed to assist in transporting the machine to his farm was not called as a witness and no explanation is offered as to why he was not. No record of the sale of any machine embodying the invention was produced. One of the witnesses testified that one of the No. 9 machines was placed upon display at an exhibition in Kansas City in the early part of 1926, but no documentary evidence as to its shipment or handling is offered, nor is there produced any documentary evidence relating to the shipment of the

machine said to have been sent for test to South America.

The introduction of the photographs of the No. 9 machine were objected to because it was urged that the negatives themselves would be the best evidence. Some, at least, of the photographic exhibits were stated by the photographer witness to have been made from the negatives only a short time before his testimony was given.

We are of the opinion that these photographs are of practically no evidentiary value, and that they probably should have been excluded entirely under the facts developed in the record.

The vellum sheet whereon the drawings are alleged to have been made in July, 1925, is certainly in a most unsatisfactory condition. The lower right-hand corner of the sheet, where it is customary to place the dates and initials, is torn away and the figures "7–12–25" with the initials "LPM" (stated to be the initials of the witness Lee P. Millard who testified that he made the drawings) appear in the lower left-hand corner in pencil marks so dim as that they now can be read only with the aid of a magnifying glass, although all other lines and notations of the drawings are reasonably clear.

It is, to say the least of it, most unusual for a concern, such as the International Harvester Company, having a drafting force and a body of trained engineers and experts, such as the record clearly indicates it does have, to treat so carelessly vital papers relating to patent matters. Usually such concerns are scrupulously careful of their records and drawings, and extreme care is taken in the notation of dates and all other matters material to the identification of such drawings. This is not a case where an inexperienced individual inventor was struggling with the solution of a problem. The individuals connected with this controversy, upon both sides, were experienced experts in their respective lines of activity.

When the record is considered as a whole, including the fact that, although the machine tested in Rexburg is said to have worked perfectly in August, 1925, the application for patent was not filed until September, 1926, and all the circumstances surrounding the parties and the occurrences are looked to, we do not feel that the junior party should prevail simply upon the arbitrary oral statements that the occurrences took place in 1925. The memories of men are too treacherous to admit of blind reliance upon them, and of all the records which it seems that the appellant, Johnston, might have produced in the way of documentary evidence, tending to support the alleged dates, nothing really helpful was produced. It seems to have been a case in which the effort was to see how little, rather than how much, could be proven.

We concur with the conclusion of the Examiner rather than with that of the Board of Appeals.

### Count 1.

As to count 1 involved in the cross-appeal of Johnston, little need be said here in view of our conclusion as to the other counts, because count 1 is in the same category as the others in respect to the reasons which control our decision relative to them. The issue relating to the amendment of MacGregor's preliminary statement and the issue as to estoppel, therefore, need not be considered.

The decision of the Board of Appeals is modified, being affirmed as to count 1, and reversed as to counts 2 to 9, inclusive.

Modified.

HATFIELD, Associate Judge, did not participate.