## CHANDLER v. MOCK.

**Patent Appeal No. 5000.**

Court of Customs and Patent Appeals.
June 22, 1945.

Edgar Cummings Sanborn, of New York City, and Edwin R. Hutchinson, of Washington, D. C., for appellant.

W. A. Gebhardt, of South Bend, Ind., and Charles M. Funkhouser, of Washington, D. C. (Scrivener & Parker and N. Douglas Parker, Jr., all of Washington, D. C., of counsel), for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, JACKSON, and O'CONNELL, Associate Judges.

O'CONNELL, Associate Judge.

This is an appeal by Chandler from an award of priority of invention to Mock in a decision of the Board of Interference Examiners of the United States Patent Office.

The interference involves appellant Chandler's patent No. 2,228,000, granted January 7, 1941, on his application filed May 2, 1938, and appellee Mock's application, Serial No. 362,572, filed October 24, 1940, as a continuation of his application, Serial No. 118,718, filed January 2, 1937.

The subject matter of the invention pertains to a carburetor and is sufficiently described in the sole count in issue, which reads:

"Fuel supply means for a throttle controlled carburetor having an air entrance

and a m'isture outlet connected to a super charger comprising, a source of fuel supply under pressure, pressure reducing means therefor, automatic means responsive to the absolute pressure at the discharge side of the supercharger for controlling the pressure reducing means, and automatic means responsive to the drop in pressure from the air entrance to the mixture outlet created by the throttle for controlling the pressure reducing means whereby the pressure on the fuel at the low pressure side of the pressure reducing means is responsive to the drop in pressure due to the throttle and also to the absolute pressure created by the supercharger."

Before the Board of Interference Examiners, appellant, the junior party, sought to establish priority of conception and reduction to practice by the testimony of the witnesses Chandler, Wiegand, and Hunt relative to certain engine and "air box" tests of the device described in the issue together with records alleged to have been made contemporaneously with the running of such tests during the latter part of August and the earlier part of September, 1936. Appellee, the senior party, submitted no testimony and for conception and reduction to practice relied on the date of his original application filed on January 2, 1937.

The board held that while the construction of appellant's device satisfied the requirement of the count, nevertheless his device was not only insufficiently tested to effect its reduction to practice, but also that his conduct during the critical period was lacking in diligence.

The crux of the question to be here decided is the sufficiency of the tests of the involved device. Appellant urges that its reduction to practice was amply established and offers the following citations to the record in support of his position:

"In September, 1936, Chandler's invention was subjected to extensive tests on an engine, by F. J. Wiegand, test engineer of the Wright Aeronautical Company, at Paterson, New Jersey (R. 252—4, Qs. 4–22). Chandler, who was present for some of the tests (R. 238—9, Qs. 61, 64–68; R. 241—2, Qs. 86–90), testified to the satisfactory operation of the apparatus and produced a record which he made, showing data compiled during certain of the tests (R. 239, Qs. 64–68). Wiegand testified that the apparatus operated successfully and performed the function for which it was intended (R. 254, Qs. 23 and 24). He accompanied his testimony by detailed test records which he made contemporaneously with the running of the tests (R. 255, Qs. 33–39)."

Appellant further contends that since the limitations of the count do not include an engine, reduction to practice was established also by his evidence relative to "air box" tests made at Detroit and Dayton.

It appears from the evidence introduced by appellant that the carburetor of a small aircraft engine which operates in the right side up position at low altitudes is a simple device. But as aircraft engines have increased in power and the art of flying has advanced, a multiplicity of new elements have been required to enable an aircraft engine to operate at high altitudes under all weather conditions and in an inverted position.

The preliminary statement made by Chandler and verified by him under oath in the interference proceeding discloses that he had been working in connection with airplane carburetors for aviation engines and had been experiencing certain difficulties with the performance of the engines which he thought were due to carburetion difficulties. This was the problem that confronted Chandler and according to the respective specifications of the two devices here submitted by him, Chandler sought to solve the problem of the advanced art of aviation carburetion by the invention of the device described in the count.

In his testimony, Chandler identified Exhibit 1 as a carburetor which was developed by his organization prior to the date of the invention here in issue. In the original carburetor, Exhibit 1, described as an airplane carburetor in the application of Milton J. Kittler, Serial No. 107,386, filed October 24, 1936, the fuel flow was varied under the control of supercharger pressure, but it lacked what is called "load compensation." To improve that feature of the original carburetor, the invention here in issue, described in appellant's application also as an airplane carburetor, was developed by Chandler to supplement the original carburetor by adding a channel suction control to the supercharger control.

The parts of the respective carburetors, Chandler testified, were structurally different, but it is noted that the carburetor here in issue was designed to function with a supercharger and the supercharger is one

of the elements defined in the count of the interference.

Appellee Mock urged before the Board of Interference Examiners that since the device in issue was designed to function in an airplane engine, appellant was obliged to put the carburetor to a test on an engine in an airplane. The board overruled Mock's argument and held that the structure claimed by appellant could be applied to other engines because the count of the interference was not limited to an airplane engine. As hereinbefore stated, appellant here urges further that the count was not limited to an engine and he was therefore not required to use an engine in testing the device in order to establish its reduction to practice.

To constitute reduction to practice of a complex mechanical device as the basis for awarding priority of invention, the law requires a preponderance of evidence in an interference proceeding to the effect that the device was subjected to a test under actual working conditions which demonstrated not that the device might work, but that it actually did work. See Jacke v. Long (Jacke v. Goldsborough), 111 F.2d 184, 27 C.C.P.A., Patents, 1147; Payne v. Hurley, 71 F.2d 208, 21 C.C.A.P.A., Patents, 1144.

The engine tests relied upon by appellant were conducted by the witness Wiegand in the plant of the Wright Aeronautical Corporation at Paterson, New Jersey. Six carburetors embodying the channel suction control in combination with the supercharger pressure control were constructed by Chandler's organization and employed in making the tests. In the interference proceeding, Chandler testified that he was then unable either to locate or produce any one of the six carburetors complete upon which the tests were run.

Chandler testified further that he witnessed a test at Paterson on September 1, 1936, and as to another test and other pertinent matters, he said in response to questions by his attorney:

"Q. 64. Have you any other test record in that book which is pertinent here? A. On Page 94 we show the data taken from an engine run on September 2, 1936. This data shows air flow pressure drop, fuel flow, fuel-air ratio, supercharger pressure, diaphragm pressure and R. P. M.

"Q. 65. Was that test satisfactory? A. Yes. This was one of numerous tests that were run in arriving at a final specification. As I look at the data, it looks as though the fuel-air ratios were acceptable.

"Q. 66. Did you apply the date to that sheet? A. This sheet is marked September 2, 1936.

"Q. 67. In your handwriting? A. Yes.

"Q. 68. Was the date applied on that date? A. Yes.

"Q. 69. Is there any other record sheet in that book pertinent here? A. Page 110 of this book is another data sheet.

"Q. 70. Showing results of what? A. Showing results of a test run at Paterson. This again illustrates that the diaphragm pressures could be varied to get different mixtures as desired.

"Q. 71. Were all of these tests run with the same carburetor and the same control? A. The tests were all run with carburetor No. 12 and probably with the same control although the control was being altered and modified from time to time to get additional information concerning its characteristics and functioning.

\* \* \* \* \* \*

"Q. 86. I hand you another letter dated September 3, 1936 and ask what that letter is? A. This is a letter written by me to Scott Hunt from Paterson going over some of the development details of the carburetor and on Page 5 I mention the functioning of the control.

"Q. 87. Will you read the pertinent part on Page 5 to which you refer? A. 'The control checks itself remarkably well on the engine and they are acquiring considerable confidence in it. Better put some of Stanton's Sperm Oil on the moving parts, that is, just a film of it,' \* \* \* 'The big difference between the control on the engine and at Dayton is at wide open at Dayton it took only 10 inches diaphragm pressure to get 725 pounds. Here it took a net of 19 inches. I do not understand the difference.'

\* \* \* \* \* \*

"Q. 96. Your application for this patent was not filed until May 1938. What was the reason for the delay in filing the patent application? A. In working with this control, we developed in the latter part of 1936 [Exhibit 1] a method of obtaining this enrichment that was only a function of fuel flow in place of being a function of diaphragm pressure and fuel suction. It therefore was a more simple device to make and use in production and

after it demonstrated its ability to give the desired results we used it on the production carburetors. The carburetor with the control that we adopted for production [Exhibit 1] still lacks what we call load compensation and during 1937 a great many studies were made as to how the control, as shown in the patent No. 2228000, [here in issue] could be modified to perform the enrichening function and also to improve the load characteristics of the carburetor. These studies during this period of time were not successful and we, therefore, decided to file an application covering its original scope and use."

Wiegand testified that the engine tests at Paterson were conducted and recorded by him on log sheets. These sheets constituted the records of the engine tests, Exhibit 16, and are dated consecutively from September 4th to 12th, with the date of one sheet missing.

In response to questions propounded by appellant's attorney, Wiegand further testified:

"Q. 22. Do I correctly understand that a carburetor equipped with the unit comprising Exhibits No. 6 and No. 8 was mounted on an engine and actually run? A. That is right.

"Q. 23. Were these tests successful? That is, did the carburetor equipped with the control consisting of Exhibits No. 6 and No. 8 operate successfully? A. Yes.

"Q. 24. Did the combination perform the function for which it was intended? A. Yes."

Hunt was project engineer of the Chandler-Evans Corporation and associated with Mr. Chandler since 1917. At the time the involved tests were made he was employed as an experimental engineer. He testified that he was not present at any of the engine tests made in the Wright plant at Paterson. The evidence discloses, however, that Hunt had conducted "airbox" or "bench" tests both before and after the dates on which the engine tests were made. He identified appellant's Exhibit 13 as a letter he wrote and sent to Chandler on September 16, 1936. In this letter, written after the engine tests were completed, Hunt stated:

"I believe the reason that the diaphragm does not work properly is because there is no vent to the backside of the diaphragm. This would allow diaphragm pressure to leak past the piston valve and tend to hold the diaphragm off its seat."

Hunt further testified:

"Q. 34. What were the circumstances which occasioned the writing of this letter and the sending of the sketch? A. I had been to Dayton the day before [September 15] with Mr. Chandler. I returned to Detroit and there were certain alterations that we desired to make in the control so that the fuel-air curve would be more nearly perfect. I changed the details of the valve on our bench test at Detroit so that Mr. Chandler would be able to make further alterations if the device I shipped to him did not meet the requirements. I enclosed the sketch which gives the assembly measurements of all the parts in question so that it would not be necessary for him to remeasure all the parts if any of the porting of the valve was to be changed.

"Q. 35. Did you make, or were you present when other tests upon this invention were made? A. I was present and conducted practically all the tests that were made in Detroit in what we call the bench test. I was not present at any engine tests made at Paterson at the Wright Aeronautical Corporation although I was present at tests made in the air box at Wright Field, Dayton, Ohio, on September 15.

"Q. 36. Were all of the tests which you either made or witnessed satisfactory? A. Yes."

■ An engine is not defined as a limitation of the count here in issue and it is not for this Court to say in what manner an inventor shall make use of his device. However, the burden of proof was upon appellant to establish the use to which his carburetor was to be applied and to establish that the actual working conditions under which it was designed to function were present in making the test to which the device was subjected in order to establish its reduction to practice. McKee v. Stevens, 79 F.2d 914, 23 C.C.P.A., Patents, 701.

Appellant produced no proof as to whether the nature of the tests that were made met these requirements. It is true, as stated in his brief, that "the function of a carburetor is to mix the air, flowing to the engine, with gasoline or other combustible fuel; and to control the proportions of the mixture." Moreover, carburetors, like spark plugs, are commonly used in engines and bench or shop tests which do not meet the requirements of the actual working conditions under which such de-

vices are designed to operate are insufficient to constitute reduction to practice. Mock v. Johnson, 52 App.D.C. 300, 286 F. 639, 1923 C.D. 227; Payne v. Hurley, supra.

■ For the reasons stated, the Board of Interference Examiners was manifestly right in deciding in the instant case that appellant's "air box" and bench tests were insufficient to effect a reduction to practice.

Considered in their most favorable light, such engine tests as were conducted by appellant leave a serious doubt as to whether or not they were sufficient to effect a reduction to practice.

Appellant urges that Chandler was present at one of the tests and made a notation on the log sheet at the time. Chandler figured out that the date of that test was September 1, 1936, but the testimony of Wiegand who made the tests and the consecutive dates of the log sheets leave a doubt as to whether or not a test was run on September 1.

Chandler was shown a sheet recording a test alleged to have been run on September 2, and stated: "As I look at the data, it looks as though the fuel-air ratios were acceptable." Moreover, while the data relative to such test is alleged to be identical with the data recorded on Wiegand's work sheet, Exhibit 16, nevertheless Chandler did not state he was present during the test or that he actually conducted it.

As correctly indicated in the decision of the Board of Interference Examiners apparently no two of appellant's witnesses described the same tests and, accordingly, they do not corroborate each other in this respect; and as to the records of the engine tests, they do not of themselves show whether the operation of the carburetor was successful. Wiegand who made them was not asked by appellant to explain or interpret them. Moreover, Exhibit 15 shows that during the period of its testing, Wiegand was instructing his subordinates regarding changes to be made in the control of the device on which he was making the test.

It is true, as pointed out in appellee's brief, that the witness Wiegand should have clearly and satisfactorily interpreted and explained the complex tabulations of figures compiled by him, "how they were obtained, what they meant, how the apparatus was connected, and what particular data showed that the control functioned as required by the count, namely 'where-

by the pressure on the fuel at the low pressure side of the pressure reducing means is responsive to the drop in pressure due to the throttle and also to the absolute pressure created by the supercharger'. The witness did not pursue this course, however, and the test records standing alone are meaningless."

Wiegand's testimony was given some six years after the time when he had conducted the tests and made the records thereof. His recollection of what then took place as to the successful operation of the device should have been directly stated by him. Instead of doing that, the words were put in his mouth in the form of a conclusion by the leading questions of counsel. In appraising the value of evidence given under such circumstances, the Supreme Court of the United States made the following comment in the case of The Barbed Wire Patent, (Washburn & Moen Mfg. Co. v. Beat 'Em All Barbed-Wire Co.), 143 U.S. 275, 284, 12 S.Ct. 443, 447, 36 L. Ed. 154: "Witnesses whose memories are prodded by the eagerness of interested parties to elicit testimony favorable to themselves are not usually to be depended upon for accurate information."

Relative to the oral testimony of his "expert" witnesses who stated that the device here in issue successfully operated, appellant states in his brief, with italics: "Actually, Wiegand, like Chandler, *is a carburetor engineer of the highest standing, thoroughly skilled in this art, and completely familiar with the devices tested and their operation.* The testimony of such witnesses as to the success of the tests which they conducted would be of adequate probative value to establish reduction to practice of the tested devices even if records of the tests had not been presented." Furthermore, *"Ample opportunity existed for full cross-examination of Wiegand upon his test data, and for the presentation of rebuttal testimony,* had opposing counsel entertained any doubt that the records did not support his assertion of satisfactory operation of the apparatus tested."

■ While a witness in a court of justice is not to be disparaged because he has won renown in his field of endeavor, nevertheless his reputation cannot be utilized to cover a deficiency in evidence. See Marconi Wireless Telegraph Company of America v. United States, 320 U.S. 1, 63 S.Ct. 1393, 87 L.Ed. 1731.

Appellant urges in his brief that "The Wright Company and its engineer, Wiegand, were *obviously* acting with Chandler's consent, and in his behalf, in testing the apparatus," and [with reference to certain records] that "these increased pressure values in the engine manifold were, *of course*, due to the presence of the supercharger for use with which the Chandler control apparatus was designed." (Italics supplied.)

The facts upon which appellant bases the foregoing conclusions were essential to his case in establishing successful reduction to practice, and, if actually present in the operation of the tests, it would have been a simple matter to elicit testimony to that effect and establish such facts by a preponderance of evidence. Appellant has failed to meet the requirements of the law in this respect.

██ The following observations made by this Court in two previously decided cases in which the junior party sought to establish prior conception and reduction to practice in an interference proceeding are here applicable:

"It will be observed from the testimony quoted that in each of the questions propounded to this witness he was asked if the lamps were 'successfully operated' or if the lamp was a 'satisfactory development.' There appears to be no reason why the facts upon which his conclusion was based should not have been brought out. *True, they could have been brought out upon cross-examination; nevertheless, the burden was upon appellants to establish priority of invention, and it was their duty to establish facts upon which the conclusion of satisfactory operation was based.*" [Italics supplied.] Marden and Nicholson v. Braselton, 119 F.2d 174, 183, 28 C.C.P.A., Patents, 1077.

"* * * This is not a case where an inexperienced individual inventor was struggling with the solution of a problem. The individuals connected with this controversy, upon both sides, were experienced experts in their respective lines of activity.

"When the record is considered as a whole, including the fact that, although the machine tested in Rexburg is said to have worked perfectly in August, 1925, the application for patent was not filed until September, 1926, and all the circumstances surrounding the parties and the occurrences are looked to, we do not feel that the junior party should prevail simply upon the arbitrary oral statements that the occurrences took place in 1925. The memories of men are too treacherous to admit of blind reliance upon them, and of all the records which it seems that the appellant, Johnston, might have produced in the way of documentary evidence, tending to support the alleged dates, nothing really helpful was produced. *It seems to have been a case in which the effort was to see how little, rather than how much, could be proven.*" [Italics supplied]. MacGregor v. Johnston, 71 F.2d 165, 168, 21 C.C.P.A., Patents, 1216.

Appellant urges that the involved tests demonstrated that the basic structure of the invention here in issue was capable of producing the result sought to be accomplished and that only slight details of such structure were altered in a desire to achieve the best performance of the tested device. This contention was rejected by the officials of the Patent Office who are employed as experts in the determination of highly technical questions involving complex mechanical devices and it is impossible to sustain appellant's contention here in the absence of a preponderance of evidence to sustain it. The cases relied upon by appellant in this connection disclose that in each instance the invention described in the issue had been reduced to practice and that subsequent alterations were made to perfect its operation. Such is not the case here.

Chandler stated in his testimony that the invention described in the issue is structurally different from his original carburetor and it is not disputed by appellant that his patent application herein describes a structure that is different from the construction of the device tested.

In Chandler's own words [June 11, 1942]: "* * * The carburetor with the control that we adopted for production still lacks what we call load compensation and during 1937 a great many studies were made as to how the control, as shown in the patent No. 2,228,000, could be modified to perform the enrichening function and also to improve the load characteristics of the carburetor. These studies during this period of time were not successful and we, therefore, decided to file an application covering its original scope and use."

██ The record here submitted fully warrants the holding of the Board of Interference Examiners to the effect that

appellant's evidence failed to establish that his device was tested sufficiently or with the proper results to effect its reduction to practice and that since he was not actively engaged in reducing his device to practice at and immediately prior to the time appellee filed his application and entered the field on January 2, 1937, nor for sixteen months thereafter until appellant filed his application on May 2, 1938, he was lacking in diligence during the critical period.

It would serve no useful purpose to here state and discuss other questions presented by the respective parties inasmuch as appellant has failed to show reduction to practice prior to the filing of appellee's application on January 2, 1937, and was clearly lacking in diligence during the critical period.

For the reasons stated, appellee is entitled to an award of priority and the decision of the Board of Interference Examiners is affirmed.

Affirmed.