**Scott F. HUNT, Appellant,**

v.

**Irven E. COFFEY, Appellee**
(two cases).

**Irven E. COFFEY, Appellant,**

v.

**Scott F. HUNT, Appellee**
(two cases).

**Patent Appeal Nos. 5880–5883.**

United States Court of Customs and Patent Appeals.

July 1, 1955.

N. D. Parker, Jr., Washington, D. C., and M. A. Hobbs, South Bend, Ind., for Hunt.

George R. Ericson, St. Louis, Mo., (Bertram H. Mann, Jr., St. Louis, Mo., and Dos Hatfield, Washington, D. C., of counsel), for Coffey.

Before O'CONNELL, Acting Chief Judge, JOHNSON, WORLEY, and COLE, Associate Judges [original argument before GARRETT, Chief Judge, and O'CONNELL, JOHNSON, WORLEY, and COLE, Associate Judges].

JOHNSON, Judge.

These are appeals by Scott F. Hunt from the decision of the Board of Interference Examiners of the United States Patent Office awarding priority of invention to the party Irven E. Coffey in Interferences No. 82,555 and 82,262. These interferences involved Hunt's patent application, Serial No. 727,648, filed May 26, 1934 (a continuation of the joint application of Scott F. Hunt and Elmer Olson, Serial No. 575,025, filed November 14, 1931) and the Coffey patents No. 2,325,372 (application Serial No. 134,070, filed March 31, 1937) and No. 2,085,351 (application Serial No. 679,- 201, filed July 6, 1933). The later-issued Coffey patent is a continuation-in-part of and therefore entitled to the filing date of the earlier-issued Coffey patent.

The manner in which Interferences Nos. 82,555 and 82,262 originated and the background of these interferences is fully set forth in the companion interference, Henning v. Hunt, 223 F.2d 926, 42 C.C.P.A.Patents ——. This factual situation will therefore not be repeated here. It is to be noted that the party

Coffey filed cross appeals to Hunt's appeals. The substance of these cross appeals relates to points of law which were fully treated in Henning v. Hunt, supra, and these matters will not be treated in this opinion.

Both appeals will be treated in this one opinion because of the related nature of the subject matter.

The inventions here involved relate to carburetors for internal combustion engines, and more particularly to means for automatically controlling the position of the choke valve of the carburetor in response to variations in the temperature and suction developed by the engine during its operation. The counts in issue are:

"Interference No. 82,262

"1. In combination with an internal combustion engine, a carburetor having a choke valve, temperature responsive means yieldingly urging the valve toward closed position at low temperatures, additional means resisting opening movement of the valve, and suction operated means operative to render said additional means inoperative and to move the valve to at least partially opened position against the force of the temperature responsive means, *said choke valve being moved to fully open position when the normal operating temperature is reached or exceeded and remaining in such fully open position as long as said normal operating temperature is maintained or exceeded regardless of suction.*

"2. In combination with an internal combustion engine, a carburetor having a throttle and a pressure responsive choke valve, means operative below a predetermined temperature to yieldingly urge the valve toward closed position, additional means resisting opening movement of the valve, and means responsive to a predetermined suction posterior to the throttle for rendering said additional means inoperative and for moving the valve to at least partially opened position against the force of the temperature responsive means, *said choke valve being moved to fully open position when the normal operating temperature is reached or exceeded and remaining in such fully open position as long as said normal operating temperature is maintained or exceeded regardless of suction.* (Italics added.)

"Interference No. 82,555.

"In combination with an internal combustion engine, a carburetor having a throttle and a pressure responsive choke valve, temperature responsive means yieldingly urging the valve toward closed position and rendered inoperative at high temperatures, and means responsive to suction posterior to the throttle for moving the valve to a partially opened position against the force of the temperature responsive means, *said choke valve being moved to fully open position when the normal operating temperature is reached or exceeded and remaining in such fully open position as long as said normal operating temperature is maintained or exceeded regardless of suction.* (Italics added.)"

It is to be noted that the above counts, in the order set forth, are claims 28, 29, and 27, respectively, of the Hunt application. It can be seen by reference to the companion interference, Henning v. Hunt, supra, that these claims were obtained by the party Hunt in an *ex parte* appeal to the district court in Civil Action 20,023.

We do not deem it necessary, at this point, to fully describe the respective structures involved since the necessary descriptions will be set forth hereafter at the appropriate portions of this decision. However, we do wish to point out that the appeal in this case revolves primarily about the interpretation given to the italicized portions of the above counts by the Board of Interference Examiners of the Patent Office.

The board, in reaching its decision, was of the opinion that the italicized portions of the above counts, in order to read on the Hunt disclosure, must be limited to a running engine. That is, the choke valve could only remain in fully open position as long as the engine was running. Therefore, the board felt that the term "regardless of suction" meant regardless of suction while the engine was running and could not be extended, in view of the original disclosure and subsequent testimony, to include the condition where the engine was stopped since both said disclosure and subsequent testimony showed that when the engine was stopped the choke valve would close. The board also found that the Coffey disclosure was also limited to a running engine, and that both the Hunt and Coffey disclosures read on the counts when the counts were interpreted in the above-described manner. The board also found that Coffey's Exhibit 1, a carburetor having an automatic choke which was built during late 1930 and early 1931, supported the counts, and that said exhibit was constructed and adequately tested, and constituted a reduction to practice as of March 1931. Insofar as pertinent here, Hunt relied on his filing date of November 14, 1931 for a constructive reduction to practice. The board accordingly found that Coffey was the first to conceive the invention, and the first to reduce it to practice, and was thus given the award of priority.

The issues in this appeal relate to the findings of the board as set forth in the preceding paragraph. First of all, Hunt contends that the above-italicized portions of the counts should not be limited to a running engine, and when construed broadly, will read on an engine which is not running. He further states that both the Coffey and Hunt disclosures will support the count when it is construed broadly; that is, when neither disclosure is limited to a running engine. Hunt then argues that the Coffey Exhibit 1, which was relied on for a reduction to practice is limited to a running engine, and will therefore not support the counts,

when construed broadly, because the choke valve of Exhibit 1, would close when the engine is stopped. Hunt then concludes that since Exhibit 1 will not support the broadly construed count, it cannot be relied on as a reduction to practice, and under this state of facts Coffey must rely on his filing date of July 6, 1933, and therefore Hunt was the first to conceive and the first to reduce to practice and is entitled to priority. In addition to the foregoing, Hunt urges that Coffey Exhibit 1 was never adequately tested, and cannot be relied on as a reduction to practice.

The first question for our determination is whether the Hunt disclosure will support the count when it is not limited to a running engine. More specifically, we must determine from the record whether the choke valve of Hunt will remain open when the engine is not running.

In the Hunt-Olson application, Serial No. 575,025, filed November 14, 1931, the following is stated:

\* \* \* \* \* \*

" \* \* \* When arm 68 [an arm which is linked to the choke valve] is left free to move downwardly [when there is no suction in the carburetor], links, 70 and 72, move under the influence of gravity and of the element 62 [thermostat] to a position approaching alignment. [When these links are in alignment the choke valve is closed.] \* \* \*. [Matter in brackets added.]

\* \* \* \* \* \*

"\* \* . \* [when the thermostat is fully heated up] the thermostat [62] has no effect on the operation of the choke valve, which remains fully open as long as the engine is running. \* \* \*. [Matter in brackets added.]"

The first of the foregoing quoted excerpts from the Hunt-Olson specification appears to indicate that when the engine is not running, the choke valve is closed. However, it must be admitted that this first excerpt is ambiguous since

it is not clear whether the links or the thermostat cause the choke valve to close. However, the second quoted excerpt clarifies the first excerpt somewhat since it is stated that when the thermostat [62] is heated up, *"the choke valve * * * remains fully open as long as the engine is running."* The thermostat has no effect on the choke valve when the engine is hot, whether the engine is running or not running. If the thermostat has no effect on the choke valve when the engine is hot but not running, and the links tend to close the choke valve when the engine is hot but not running, it would certainly seem that the choke would tend to close when the engine is not running because of the influence of gravity on the links connected to the choke valve.

In addition to the foregoing analysis, it is to be noted that in an amendment to the Hunt-Olson application, dated November 17, 1932, the following appeared under the remarks which were submitted with the amendment:

\* \* \* \* \* \*

"New claims 18 to 20 recite, in combination with the other novel features, an arrangement whereby the weight of the connection to the choke valve tends to close the valve. In the combinations recited in these claims, this feature also appears to be patentably novel.

\* \* \* \* \* \*

These remarks were submitted in an attempt to overcome an *ex parte* rejection. However, they seem to clearly indicate that our above analysis that the choke valve will close when the engine is hot but not running is correct.

In an amendment submitted on July 7, 1933, during the *ex parte* prosecution of the application, the following appears:

\* \* \* \* \* \*

"Claim 19 has been amended for accuracy. In applicants' device, the parts 72, 70, 66, 68, 26 and 24 all tend by their weight to close the choke valve 18. The result is that when the engine is stopped, the choke valve is gradually moved to closed position by the weight of these parts, which assists the thermostat in the operation of closing the choke. No such action is present in Stokes, where the weight of the parts tends to open the choke, nor in Duffy, where the weight of parts 19, 20 and 21 apparently tends to move the choke to some intermediate position corresponding to a substantially vertical position of member 21. The claim now further distinguishes from Duffy in specifying that the thermostat is mechanically connected to the choke valve.

\* \* \* \* \* \*

This would again indicate that the weight of the links affixed to the choke valve would tend to close the choke valve when the engine is stopped.

In addition to the foregoing, the following was brought out on the cross-examination of the inventor Hunt, during the taking of testimony during the interference:

\* \* \* \* \* \*

"XQ190. In the construction shown in Figures 1, 2, 3 of the Hunt-Olson application, 575,025, does the weight of the parts which are connected to the choke valve serve to move the choke valve to closed position when the engine is hot but not running? A. You didn't name the parts.

"Mr. Ritter: Will you read the question, Mr. Stenographer, for the witness (Question read to witness.)

"A. Yes.

\* \* \* \* \* \*

It would certainly seem that this testimony of the inventor himself would be indicative of the fact that the weight of the parts which are connected to the choke valve serve to move the choke valve to closed position when the engine is hot but not running.

Further Hunt testimony seems to bear out his preceding testimony as follows:

\* \* \* \* \* \*

"Mr. Ritter: in view of the statement put upon the record by your

counsel that I had called your attention to a matter which was only in a claim and was inserted after the application was filed and his intimation that there was no matter of the same nature in the specification, I read in the following statement, Page 6 of the Hunt-Olson application 575,025 beginning at Line 9 of that page: "When arm 68 is left free to move downwardly, links 70 and 72, due to their position with respect to each other, move under the influence of gravity and of the element 62 to a position approaching alignment, this position being limited by an adjustable stop 74 positioned adjacent part 71.

"XQ223. When the engine is hot and the element 62, that is the thermostat, is not exerting any force upon the choke valve would you not understand from that statement of the specification that the links 70 and 72 would move under the influence of gravity and cause the choke valve to close through the parts connected between the links and the choke valve? A. Yes.

\* \* \* \* \* \*

Hunt's counsel attempt to minimize the effect of the above-quoted Hunt testimony by the following statement in their brief:

\* \* \* \* \* \*

"The foregoing statements were made by the inventor Hunt on March 19, 1949 \* \* \*. He testified on redirect examination that he had no copy of the application; had not seen a copy since the Spring of 1935 (*fourteen years previously*), and only *looked at the picture just before we came in.*"

\* \* \* \* \* \*

"It is not surprising, due to the fourteen-year lapse of time, that the witness Hunt did not appreciate or recall that the parts 70 and 72 only move under the influence of gravity to close the choke valve *in conjunction with the action of the thermostat as the engine cools.* The party

Hunt contends here, that the construction and operation of the invention should be governed by what is specifically disclosed in the Hunt-Olson application, as originally filed, and not by the testimony of Hunt, who had not seen the application for fourteen years. \* \* \*

\* \* \* \* \* \*

It is our opinion, on evaluating the specification, the *ex parte* amendments, and the inventor Hunt's own testimony that the Hunt-Olson application, as originally filed, disclosed an arrangement where the choke valve closed when the engine was hot and not running. We therefore conclude that the board was not in error in limiting the counts to a running engine.

There is no question presented here as to whether the Coffey disclosure is limited to a running engine, since, as we have shown above, this mode of operation is conceded by Hunt. It is to be further noted that there is no question as to whether the choke of Coffey Exhibit 1 will only remain open as long as the engine is running but will close when the engine is stopped since the Hunt brief in discussing the exhibit states, "\* \* \* *the choke valve would close* when the engine, at normal operating temperature, is stopped, so that no suction is present to influence the parts constituting the automatic choke."

Therefore, the only remaining question for our consideration is whether Coffey Exhibit 1 was ever adequately tested so that it can be relied on as an actual reduction to practice.

A review of the facts in the record indicate that Coffey Exhibit 1 was actually mounted on an automobile and tested by him late in 1930 and early in 1931. There seems to be no dispute as to this. The main contention of Hunt is that there was no proof in the record of testing the device at low temperatures. It appears from Hunt's brief that he feels that the device should have been tested at zero degrees (evidently Fahrenheit).

However, the following testimony of one Duke, who seemed quite familiar with the details of construction of Exhibit 1, does appear in the record on behalf of Coffey. It is stated that Coffey visited Duke early in 1931, and with respect to said visit Duke testified as follows:

\* \* \* \* \* \*

"Q. 17. What did he [Coffey] tell you?

"A. Well he showed me first. He came into the house, it was a very cold night—he and his wife, in fact, both of them came in, and after we had sat there and talked for an hour or so, he said he would like to have me come outside, he would like to show me something, so I went outside with him,· and he said 'Get in the Car,' and I got in the car and he said to me 'Now, watch this, I am not using my choke.' And he stepped on the starter and the car started right away. And he said 'We will take a little ride.' We rode around four or five blocks, and the thing seemed to run very smoothly, and he wanted to know what I thought of that, and I thought that was fine. We came back to the house, and he said 'I will show you now what I wanted to show you,' and he opened the hood of the car and showed me a device he had on there that took care of choking the car automatically instead of using the hand choke, and he explained it to me.

"Q. 18. You say that the night when Mr. Coffey first demonstrated his car on which the automatic choke was installed was a cold night?

"A. A very cold night.

"Q. 19. Why do you say that?

"A. Well, because I had put my car away just before he drove up, and I had to use the choke and had trouble starting it, and there was a fire in the house, and we all were sitting around the fire. It was a small heater. [Matter in brackets added].

\* \* \* \* \* \*

It is to be noted that the foregoing testimony does not give any information as to exact temperatures. However, it is to be noted that it was "cold;" that the car Coffey had the automatic choke installed on was apparently cold when it was started; and that Duke's own car had to be choked manually to start it that same evening.

Further testimony indicates that the Coffey carburetor utilizing the automatic choke was used with satisfactory results during the winter of early 1931 when the temperature dropped as low as 40° F.

It is to be further noted that a Coffey witness, Edelen, who had been a carburetor engineer since 1923, was called on behalf of the party Coffey, and testified as follows relative to the functions of automatic chokes.

\* \* \* \* \* \*

"Q. 15. \* \* \* What functions does an automatic choke have to perform in order to be successful? A. It must close the choke and provide rich enough mixture for starting and automatically provide the correct mixture during the warm-up period.

"Q. 16. What causes the automatic choke to provide any mixture at all? A. The closing of the choke.

"Q. 17. Now, I presume you are speaking of automatic chokes for internal combustion engines? A. Yes.

"Q. 18. At what times in the operation of an engine is it necessary to have a choke of any kind? A. If the carburetor is properly calibrated for normal temperatures, automatic choke should be used at any temperatures below the normal.

"Q. 19. And what do you consider normal temperatures? A. From seventy degrees and higher.

"Q. 20. Now, below seventy degrees, is it necessary to use a choke to obtain proper operation of the engine? A. Yes.

\* \* \* \* \* \*

It is to be noted from the foregoing testimony, and it is not disputed in appellant Hunt's brief, that a choke is necessary for proper operation of an engine below 70° F.

Hunt, in his brief, contends that a proper test of an automatic choke should be made at temperatures of at least 0° F. The record shows that various witnesses, including Coffey's witnesses, testified that manufacturers were testing automatic chokes at temperatures of 0° F.

In view of the facts which appear in the record, including those noted above, we come to the conclusion that the Coffey carburetor was tested at temperatures below 70° F. and probably at temperatures at low as 40° F. At least it was tested at temperatures which required choking of an engine for proper operation thereof. Therefore, the ultimate question relating to this aspect of the case, in our opinion, is whether the testing at the above-mentioned range of temperatures was proper for adequate testing of the device, in view of the fact that carburetor manufacturers tested these devices at 0° F.

In support of his contentions that there was no adequate testing of the Coffey device for an actual reduction to practice, Hunt states that the principles laid down by this court in Chandler v. Mock, 150 F.2d 563, 32 C.C.P.A., Patents, 1183, and Jorgensen v. Shaff, 189 F. 2d 264, 38 C.C.P.A., Patents, 1061, should apply. However, we believe that these cases are inapposite.

In Chandler v. Mock, supra [150 F.2d 565], an interference involving a carburetor, the evidence showed that the carburetor had been tested in the laboratory but not in actual operation. In that case it was stated, insofar as pertinent here, as follows:

"To constitute reduction to practice of a complex mechanical device as the basis for awarding priority of invention, the law requires a preponderance of evidence in an interference proceeding to the effect that the device was subjected to a test *under actual working conditions* which demonstrated not that the device might work, but that it actually did work." (Emphasis added.)

The court held that since the device under consideration, a carburetor, was not tested under actual working conditions, it did not constitute a reduction to practice.

In the present case, the evidence shows that the Coffey automatic choke operated successfully on an automobile engine under conditions which required the use of a choke. Therefore we think that it was tested under actual working conditions notwithstanding that it was not shown in the record that it had been tested as low as 0° F., the temperature which appears to have been required by commercial standards.

Relative to Jorgensen v. Shaff, supra [189 F.2d 268], appellant Hunt cites the following portion of said case:

"While testimony was being taken, the control device attached to a Schebler carburetor was operated inter partes at a temperature of 22° Fahrenheit with satisfactory results. While that might be a circumstance favoring appellant, nevertheless, it has long been established that in the absence of adequate corroboration of reduction to practice, successful operation of a device many years subsequent to its alleged reduction to practice cannot be considered as proof thereof."

The carburetor which was tested, in the manner set forth in the above quoted portion of the opinion, was not the actual device which had been reduced to practice but a substantial duplicate thereof constructed for purposes of the interference. Furthermore, in the Jorgensen case, the court felt that the witnesses

who testified as to the successful operation of the carburetor did not provide adequate corroboration of reduction to practice primarily because, it appears from the opinion, most of the witnesses were incapable of understanding its operation. The main holding of the Jorgensen case, insofar as pertinent here, was that successful *inter partes* tests of a substantial duplicate of the original device, these tests having been made many years subsequent to the date of alleged reduction to practice, could not be relied on as proof of reduction to practice where there was inadequate corroboration of reduction to practice.

However, the facts in the case at bar are different. Coffey Exhibit 1, which is being relied on as a reduction to practice, is the actual automatic choke which was installed in Coffey's automobile. This was testified to by Coffey witness Polaski who had actually assisted in the making of Exhibit 1, and who stated that he saw it operate satisfactorily after installation into Coffey's automobile. It might be further noted that Polaski's testimony indicated that he was quite familiar with the construction of the choke and its manner of operation. Polaski also testified that after Exhibit 1 was taken off of the Coffey car it was given to him for safekeeping, and that no changes had been made in it since the time it was originally completed.

Thus, in the present case we do *not* have the situation where a "substantial duplicate" is being relied on for successful reduction to practice many years subsequent to its alleged reduction to practice, and where there is an inadequate corroboration of reduction to practice as in the Jorgensen case. In the present case we have the actual device which was made, and the testimony of witnesses competent to understand the device who actually observed it in operation and corroborated that it did operate satisfactorily at the time which is being claimed as the date of reduction to practice.

■ We are of the opinion, after reviewing the record, that the counts read on both the Hunt and Coffey disclosures, and that Coffey Exhibit 1 constitutes an actual reduction to practice of the carburetor defined in the counts. We therefore hold, as did the board, that since the record shows Coffey to be the first to conceive the invention and the first to actually reduce it to practice that he is entitled to an award of priority of the counts in issue.

In view of the foregoing reasons, we are of the opinion that the decision appealed from should be affirmed.

Affirmed.

GARRETT, C. J., did not sit on rehearing or participate in the decision.